## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### (Alexandria Division)

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 10-14519-RGM |
| AIROCARE, INC., | ) | (Chapter 11) |
| Debtor. | ) |  |

## MOTION OF DEBTOR AIROCARE, INC. FOR ORDER AUTHORIZING DEBTOR-IN-POSSESSION TO OBTAIN SECURED POST-PETITION FINANCING PURSUANT TO §§ 105 AND 364 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 2002, 4001 AND 9014

AirOcare, Inc., the debtor and debtor-in-possession in the above-captioned Chapter 11 case ("AirOcare"), hereby files this Motion (the "Motion") seeking Court authorization to obtain secured post-petition financing and other related relief and in support thereof, states as follows:

### RULE 4001(c)(1)(B) SUMMARY OF RELIEF REQUESTED

1.     By this Motion and pursuant to §§ 105 and 364 of Title 11 of the United States Code (the "Bankruptcy Code"), as supplemented by Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), AirOcare hereby seeks entry of an order approving the terms and conditions for borrowing on a secured basis.  No trustee, examiner or committee of creditors has been appointed in this case.

2.     AirOcare proposes to finance the limited ongoing operations of its business and related court proceedings, including its Chapter 11 reorganization, through a loan to be made to it by ARC, LLC (the "DIP Lender") through a post-petition financing facility.

Lawrence A. Katz (VSB 47664)
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182
Telephone:  (703) 760-1600
Facsimile:  (703) 821-8949

*Counsel to the Debtor*

3.     AirOcare's need to incur post-petition financing is compelling. AirOcare currently has limited cash on hand, approximately $12,000.00. AirOcare also presently has no ability to generate cash from operations to allow it to operate and reorganize. Absent DIP financing, AirOcare may not be able to continue its business operations, thus jeopardizing these Chapter 11 proceedings and AirOcare's ability to confirm a plan.

4.     In contemplation of the filing of this case, AirOcare negotiated a financing facility with the DIP Lender in the aggregate principal amount of up to $1,000,000.00 pursuant to the terms of a secured note (the "Secured Note") and a security agreement (the "Security Agreement"). Prior to the Petition Date, $300,000.00 was advanced to AirOcare under the financing facility.

5.     Copies of the Secured Note and the Security Agreement (collectively, the "DIP Facility") are attached hereto as Exhibits A and B. The key terms of the DIP Facility are as follows:

(a)     Amount of Facility. The DIP Facility provides for a total aggregate principal amount that can be loaned of up to $1,000,000.00. Just prior to the filing of AirOcare's Chapter 11 petition, AirOcare borrowed $300,000.00 under the DIP Facility. Accordingly, $700,000.00 remains available for borrowing under the DIP Facility post-petition.

(b)     Use of Financing. The DIP Facility will be used to fund normal and customary business expenses of AirOcare, including bankruptcy-related fees and expenses, all in accordance with the budget attached hereto as Exhibit C (the "Budget").

(c)     The Borrower. AirOcare is the sole borrower under the DIP Facility. There are no co-borrowers or guarantors of the obligations under the DIP Facility.

(d)     Interest Rates, Fees and Expenses.

(i)     Interest. The interest on advances under the DIP Facility will be the prime rate as published in the Wall Street Journal, plus 1% per annum, accrued and compounded quarterly.

(ii)     Interest Payment Date.  Interest only on the unpaid principal sum shall accrue and compound on a quarterly basis, commencing July 1, 2010, and shall be payable on the first day of each calendar quarter thereafter to maturity ("Interest Payment Date").

(iii)     Payment on Maturity.  The following amounts shall be due and payable in full on the first anniversary of the Secured Note ("Date of Maturity"): (i) three times the unpaid principal sum of all amounts advanced post-petition under the DIP Facility, and (ii) all accrued and unpaid interest.[1]

(ii)     Fees.  The DIP Lender is charging no fees in connection with the DIP Facility.

(iii)     Default Rate.  Upon an event of default, interest shall be increased by an additional 2% per annum above the applicable non-default rate until default is cured.

(e)     Term.  The Date of Maturity of the DIP Facility is May 28, 2011.

(f)     Lien Status and Priority.  For all post-petition advances, the DIP Lender will have a first priority lien and security interest upon any and all of AirOcare's assets as described in the DIP Facility;[2] provided however, that said lien shall be (i) pari passu with the lien granted by the DIP Facility for amounts advanced prepetition, and (ii) subordinate to whatever unavoidable rights BB&T Bank may have pursuant to a prepetition lien in favor of BB&T Bank[3] and a prepetition writ of garnishment served by BB&T Bank upon Ingersoll-Rand Corporation (the "Garnishment").

The DIP Lender will be permitted to perfect any and all security interests and liens granted under the DIP Facility.  The proposed order submitted herewith provides that acts taken to perfect the DIP Lender's security interests and liens will not constitute a violation of the automatic stay imposed by § 362 of the Bankruptcy Code.

---

[1] Repayment of amounts due under the Secured Note for sums advanced pre-petition will be addressed in the Debtor's Plan of Reorganization.

[2] See Security Agreement, p. 1.  The most significant asset of AirOcare is a patent described in greater detail below. The DIP Lender has a valid and unavoidable first priority security interest in the patent which has been perfected by filing with the United States Patent and Trademark Office.

[3] To the extent that BB&T has been granted a security interest in personalty that may be perfected by the filing of a UCC-1, its security interest may be senior to that held by ARC, LLC.  However, BB&T Bank did not file lien perfection documents with the United States Patent and Trademark Office.  Accordingly, it is the Debtor's position that BB&T Bank does not have a perfected security interest in AirOcare's patent.

(g)    <u>Events of Default</u>.  The prepetition Events of Default are enumerated in § 10 of the Secured Note.  AirOcare proposes that upon approval of this Motion, those events of default be deemed amended and replaced so that the following shall constitute events of default under the DIP Facility:

(i)    The failure of AirOcare to pay to the DIP Lender when due any and all amounts payable by AirOcare to the DIP Lender under the terms of the Secured Note;

(ii)    The material failure of AirOcare to perform, observe or comply with any covenants in the DIP Facility;

(iii)    The material failure of AirOcare to perform, observe or comply with any of the provisions of the DIP Facility and such failure is not cured to the satisfaction of the DIP Lender within a period of thirty (30) days after the date of written notice to AirOcare;

(iv)    If any representation and warranty contained in the DIP Facility or made in any certificate or any other information at any time given by or on behalf of AirOcare or furnished in connection with the DIP Facility shall prove to be false, incorrect or misleading in any material respect on the date as of which made;

(v)    The occurrence of a default under the provisions of the DIP Facility that is not cured within applicable cure periods, if any;

(vi)    If AirOcare shall liquidate, dissolve or terminate its existence;

(vii)    The issuance of any attachment or garnishment against property or credits of AirOcare serving as collateral under the DIP Facility, or the issuance of any attachment or garnishment against any other property of AirOcare following the Petition Date for an amount in excess, singly or in the aggregate, of $50,000, which shall not have been vacated, discharged, stayed or bonded pending appeal within thirty (30) days after the issuance thereof;

(viii)    One or more judgments or decrees shall be entered against AirOcare involving an aggregate liability (to the extent not covered by insurance) in excess of $50,000, and all such judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal within thirty (30) days after the entry thereof;

(ix)    Any part of the DIP Facility shall be terminated, revoked or declared void or invalid or unenforceable or is challenged by AirOcare;

(x)    The Court shall enter an order (i) dismissing the Chapter 11 Case, (ii) converting it to a case under Chapter 7 of the Bankruptcy Code, (iii) appointing a trustee in the Chapter 11 Case, or (iv) appointing a responsible officer or an examiner with enlarged powers relating to the operation of

AirOcare's business (beyond those set forth in §§ 1106(a)(3) or (4) of the Bankruptcy Code) unless such appointment benefits the DIP Lender;

(xi)  The Court shall enter an order granting relief from the automatic stay applicable under § 362 of the Bankruptcy Code to the holder of any lien other than liens in favor of the DIP Lender in any assets of AirOcare having an aggregate value in excess of $50,000, unless the DIP Lender consents thereto;

(xii)  The Court shall enter an order in the Chapter 11 Case amending, supplementing, modifying, staying for a period in excess of fourteen (14) days, reversing, vacating or otherwise modifying any of its orders approving the DIP Facility, specifically excluding minor modifications or modifications benefitting the DIP Lender, or AirOcare shall apply for authority to do so, absent the prior written consent of the DIP Lender;

(xiii)  AirOcare shall support (in any such case by way of any motion or other pleading filed with the Court or any other writing to another party-in-interest executed by or on behalf of AirOcare) any other person's opposition of any motion made in the Court by the DIP Lender seeking confirmation of the amount of the DIP Lender's claim or the validity and enforceability of the collateral securing the Secured Note; provided, however, that this provision shall not be construed to impair  AirOcare's right to assert positions with respect to valuation of collateral;

(xiv)  AirOcare shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Court or any other writing to another party-in-interest executed by or on behalf of AirOcare) any other person's motion to disallow in whole or in part the DIP Lender's claim in respect of any obligations under the DIP Facility which arose before the Petition Date or to challenge the validity and enforceability of the liens existing in favor of the DIP Lender (including, without limitation, any existing liens securing obligations which arose hereunder prior to the Petition Date); provided, however, that this provision shall not be construed to impair AirOcare's right to assert positions with respect to valuation of collateral;

(xv)  An order approving the terms of the DIP Facility, including the Secured Note, shall not have been entered by the Court on or before sixty (60) days after the filing of a motion seeking their approval is filed by AirOcare, unless such date is extended by the Court;

(xvi)  From and after the date of entry thereof, the Court order approving the DIP Facility shall cease to be in full force and effect (or shall have been vacated, stayed, reversed, modified or amended), in each case without the consent of the DIP Lender;

(xvii)  AirOcare shall fail in any material respect to comply with the terms of any Bankruptcy Court order approving the DIP Facility;

(xviii) An order of the Court shall be entered granting any super-priority claim or lien pari passu with or senior to the liens granted to the DIP Lender pursuant to the DIP Facility;

(xix) AirOcare shall file a Chapter 11 plan that does not provide for payment in full of the obligations under the DIP Facility or otherwise proposed on terms acceptable to the DIP Lender;

(xx) The occurrence of any change, following the Petition Date, in the financial condition of AirOcare that, in the good faith judgment of the DIP Lender, is materially adverse, and any such change is not cured to the satisfaction of the DIP Lender within thirty (30) days after the date of written notice thereof by the DIP Lender to AirOcare;

(xxi) The period of exclusivity in the Chapter 11 Case terminates;

(xxii) If the amounts disbursed by AirOcare materially vary from the disbursements approved as part of the budget submitted by AirOcare in connection with the DIP Facility; or

(xxiii) AirOcare asserts in writing that any part of the DIP Facility is unenforceable, or AirOcare asserts in writing that any lien purported to be created by any part of the DIP Facility and required hereunder or thereunder to be perfected is not (except as otherwise expressly permitted in the DIP Facility) a valid lien and prior perfected security interest in the assets or properties purported to be covered thereby.

(h) <u>Default Rights</u>. Upon an Event of Default, the amounts due and owing under the DIP Facility shall be due and payable without notice.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core matter under 28 U.S.C. § 157(b)(2)(D). Venue of this case and this Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought herein are §§ 105 and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014.

## BACKGROUND

7. On May 29, 2010 (the "Petition Date"), AirOcare filed a voluntary petition under Chapter 11 of Bankruptcy Code commencing this Chapter 11 Case (the "Chapter 11

Case").  AirOcare continues to operate its business and manage its property as debtor in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.  No request has been made for the appointment of a trustee or examiner and no official committee of creditors has been appointed in this Chapter 11 Case.

8.    AirOcare was originally organized as a limited liability company to purchase and develop a patented technology for air purification.  In 2004, the limited liability company was converted to a Delaware corporation.  Thereafter, AirOcare purchased a patent for an air purification process (the "Patent") from a Chilean businessman named Carlos Lima for the specific purpose of adapting the process for markets in the United States.  AirOcare's technology purifies air by killing airborne microbes.

9.    Throughout its history, AirOcare suffered cash flow problems.  In order to strengthen its position in the marketplace, in 2006 AirOcare engaged Citigroup to assist in a sale of the business to a larger and better capitalized company.  These efforts did not lead to a successful sale.

10.    To generate needed revenue, in 2007 AirOcare entered into a 10-year license agreement with the Hussman Corporation (the "Hussman License").  Under the Hussman License, Hussman may use AirOcare's technology in the "cold chain supply" business which encompasses low temperature food handling and processing.

11.    Hussman paid $5 million as an initial royalty.  Additional royalties were to be paid based upon sales performance, subject to a minimum royalty of $125,000.00 per quarter and with a cap of $30 million as the total maximum royalty that can be paid over the 10-year term of the license.  At the end of the license term, the technology will be the property of

Hussman.  AirOcare retains the right to license its technology for uses other than in cold chain supply applications.

12.     Despite the increased revenue from the Hussman License, AirOcare remained chronically short of cash.  AirOcare also became involved in litigation in Indiana and Maryland.  One of these lawsuits, brought by BB&T Bank in Maryland, resulted in the issuance of a writ of garnishment against Hussman's parent, Ingersoll-Rand Corporation.  In addition to the garnishment, Carlos Lima has disputed AirOcare's rights to its patent.  AirOcare disputes Lima's claims.  AirOcare is in the process of attempting to resolve its disputes with BB&T and Lima through negotiation.  However, the various claims caused Hussman to take the position prepetition that it would withhold quarterly royalty payments when due.

13.     The various litigation matters became a distraction from other aspects of AirOcare's operations as well as a drain on available cash resources.  Accordingly, AirOcare began to wind down most of its operations in 2009.  The wind-down was completed in late 2009 at which point the last of AirOcare's employees were terminated.  AirOcare's sole remaining office is in Dulles, Virginia.  AirOcare presently has no employees and its major assets are the Patent and the Hussman License.

## THE DIP FACILITY

14.     The key terms of the DIP Facility are described above in the summary found paragraphs 1 through 4 of this Motion.  Additionally, the DIP Facility documents, namely the Secured Note and the Security Agreement, are attached hereto as Exhibits A and B, respectively.

### Pre-petition Borrowing under the DIP Facility

15.     After an extensive, nine month effort to find sources of financing or

recapitalization of the company, AirOcare and the DIP Lender, ARC, LLC,[4] entered into the DIP Facility to loan up to $1,000,000.00 to AirOcare. Of this amount, $300,000.00 was funded on May 28, 2010, the day prior to the Petition Date. Accordingly, $700,000.00 of potential additional borrowing remains available under the DIP Facility.

16.    Of the $300,000.00 loaned prior to bankruptcy, $137,492.10 was used to repay bridge loans which had been advanced to AirOcare by certain insiders.

17.    AirOcare also used $150,000.00 of the borrowed funds to pay for pre-petition legal fees owed to Venable and to pay a retainer for services to be rendered in this bankruptcy case. Prior to the Petition Date, Venable applied $55,435.92 of the $150,000.00 to pay all of its outstanding and unpaid prepetition fees and expenses incurred in representing AirOcare. Venable's representation of AirOcare began on May 7, 2010 and the pre-petition amounts paid were for services all of which were rendered in May of 2010. The balance of the $150,000.00 paid to Venable, $94,564.08, was held by Venable as a retainer for services to be rendered in this bankruptcy case. Of this amount, $25,000 has been transferred to the law firm of Leach Travell Britt pursuant to the Order entered on July 25, 2010 [Docket No. 54] authorizing the Debtor's retention of that firm as special conflicts counsel.

18.    The remaining $12,507.90 from the $300,000.00 advanced under the DIP Facility was used to pay certain trade creditors prior to the Petition Date for goods and services obtained by AirOcare in the ordinary course. The balance of the borrowed funds, $11,235.77, is currently on deposit in AirOcare's DIP account (the "DIP Account") and represents the only cash available to AirOcare at this time.

---

[4] The current directors of the Debtor also hold membership interests in the DIP Lender. Collectively, they hold membership interests of approximately 50%, with the balance of the membership in the DIP Lender being held by non-director shareholders of the Debtor (approximately 30%) and unrelated parties (approximately 20%).

19.     By this Motion, AirOcare requests approval of the pre-petition secured claims of the DIP Lender made pursuant to the terms of the DIP Facility as they existed on the Petition Date.[5]

### Amendment of the DIP Facility

20.     The events of default under the original Secured Note were conventional events of default for non-bankruptcy lending, and many of the events of default were triggered by the filing of bankruptcy.  AirOcare requests that upon approval of this Motion the events of default incorporated above be deemed to replace the original events of default contained in the Secured Note.  The proposed amended events of default are primarily related to events which can or may occur in the course of a Chapter 11 reorganization case and are hence more appropriate for the DIP Facility at this phase of AirOcare's reorganization.

### THE NEED FOR FINANCING

21.     As will be detailed below, other than the DIP Facility, AirOcare has been unable to obtain an extension of credit to fund its operations on either a secured or unsecured basis.  Without an immediate post-petition credit facility, AirOcare will be unable to take the necessary steps required to preserve the value of its business assets, including the Patent, and to reorganize.

22.     Upon approval of the DIP Facility, the DIP Lender will make available to AirOcare a line of credit facility in the remaining aggregate principal amount of up to $700,000.00.  Without the DIP Facility, AirOcare will be severely hampered, if not entirely thwarted, in its efforts to reorganize.  Consequently, this Court should approve the DIP Facility.

---

[5] Repayment of amounts due under the Secured Note for sums advanced pre-petition will be addressed in the Debtor's Plan of Reorganization.  See supra note 1 and accompanying text.

23.     To secure the sums advanced by the DIP Lender, AirOcare proposes to grant the DIP Lender a first priority lien and security interest consistent with that granted under the Security Agreement upon any and all of its assets as described in the Security Agreement; provided, however that said lien shall be (i) pari passu with the lien securing amounts advanced prepetition under the DIP Facility, and (ii) subordinate to any valid, perfected and unavoidable interest that BB&T has pursuant to its Security Agreement and under the Garnishment as of the Petition Date.[6]

### THE DIP FACILITY SHOULD BE APPROVED

24.     The key terms of the DIP Facility are described in detail above.  AirOcare has undertaken reasonable efforts to secure financing on both unsecured and secured bases.  Despite these efforts, AirOcare has been unable to find any lender, other than the DIP Lender, who is willing to provide it credit on either a secured or unsecured basis.  Therefore, under all of the circumstances, the terms of the DIP Facility are fair and reasonable, and the DIP Facility will provide AirOcare with the funds necessary to reorganize.  AirOcare should be permitted to obtain credit on the terms of the DIP Facility under § 364 of the Bankruptcy Code.

25.     Debtors may obtain post-petition secured credit under § 364 of the Bankruptcy Code.  Section 364 of the Bankruptcy Code provides, in pertinent part, as follows:

(a)     If the trustee is authorized to operate the business of the debtor under section 721, 1108, 1304, 1203, or 1204 of this title, unless the court orders otherwise, the trustee may obtain unsecured credit and incur unsecured debt in the ordinary course of business allowable under section 503(b)(1) of this title as an administrative expense.

(b)     The court, after notice and a hearing, may authorize the trustee to obtain unsecured credit or to incur unsecured debt other than under subsection (a) of this section, allowable under section 503(b)(1) of this title as an administrative expense.

---

[6] See supra, notes 2 and 3.

(c)     If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt --

(1)     with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2)     secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3)     secured by a junior lien on property of the estate that is subject to a lien.

(d)(1)  The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if --

(A)     the trustee is unable to obtain such credit otherwise: and

(B)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior lien is proposed to be granted.

11 U.S.C. § 364(a) through (d)(1).

26.     Generally, § 364(c)(1) through (3) of the Bankruptcy Code requires a debtor to demonstrate that alternative unsecured sources of credit are not available under the other provisions of § 364 of the Bankruptcy Code.  See In re Ames Dep't Stores, Inc., 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990).  Although there is "no duty to seek credit from every possible lender before concluding that such credit is unavailable," the statute obligates a debtor to show "by a good faith effort that credit was not available without the senior lien."  Bray v. Shenandoah Fed. Savs. and Loan Assoc. (In re Snowshoe Co., Inc.), 789 F.2d 1085, 1088 (4th Cir. 1986). Against this statutory backdrop, courts will evaluate the facts and circumstances of the debtor's case, and will accord significant weight to the necessity for obtaining the financing.  See, e.g., In re Snowshoe, 789 F.2d at 1088;  In re Ames, 115 B.R. at 40.

27.     As stated above, it took over nine months for AirOcare to find finance providers willing to fund the DIP Facility.  The only terms acceptable to the DIP Lender are the terms of the DIP Facility.

28.     Moreover, given the lack of current cash flow and the uncertainty of future cash flow, it is impossible for AirOcare to obtain alternative post-petition financing on an unsecured basis in the ordinary course of business pursuant to § 364(a) of the Bankruptcy Code.  AirOcare is also unable to obtain unsecured credit allowable under § 503(b)(1) as an administrative expense pursuant to § 364(b) of the Bankruptcy Code for the same reason.  Rather, the circumstances of this case which make unsecured credit unavailable under such terms require AirOcare to obtain secured financing under § 364(c) of the Bankruptcy Code.

29.     In fact, the CEO of AirOcare, Eric Wells, has recently met with a lender to discuss obtaining financing.  The lender refused to provide any financing to AirOcare because its major asset, the Hussman License and the Patent, were under a cloud due to the BB&T Garnishment, the claims of Carlos Lima and Hussman's refusal to make royalty payments.  Given the lack of a clear source of revenue to repay any loan, the prospective lender declined to provide financing on any basis, either secured or unsecured.  In view of the response of this lender to AirOcare's request for financing, any other attempts to obtain financing from traditional sources of funding would be futile and have not been undertaken.

30.     AirOcare can satisfy the showing required by § 364(c) of the Bankruptcy Code.  Courts utilize a number of factors to evaluate a debtor's eligibility to obtain financing under § 364(c), including the following:

        a.      whether the proposed financing is the exercise of sound and reasonable business judgment;

b.     whether the proposed financing is necessary, essential and appropriate for the continued operation of the debtor's business and preservation of the assets of the estate;

c.     whether the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender;

d.     whether the proposed financing is in the best interest of the estate and creditors;

e.     whether the financing terms were negotiated in good faith and at arm's length between the debtor and proposed lender;

f.     whether there is no alternative financing available on any other basis; and

g.     whether any better offers, bids or timely proposals are before the court.

See e.g. In re Farmland Industries, Inc., 294 B.R. 855, 879-80 (Bankr. W.D. Mo. 2003)(and cases cited therein);  In re Phase-1 Molecular Toxicology, Inc., 285 B.R. 494, 495 (Bankr. D. N.M. 2002);  In re Western Pacific Airlines, Inc. 223 B.R. 567, 572 (Bankr. D. Colo. 1997).

31.     AirOcare can meet each of the above factors with respect to the proposed DIP Facility.  First, the financing is the result of sound and reasonable business judgment because ongoing operations are not possible without financing.  The second factor is also satisfied for the same reason – without the DIP Facility, AirOcare cannot maintain its assets, including the Patent, and carry on its post-petition business.

32.     Additionally, the terms of the DIP Facility are appropriate, which satisfies the third factor. AirOcare has been able to obtain financing from the DIP Lender that offers, at the only terms available, an appropriate level of borrowing for its reorganization needs and the preservation of its assets, including the Patent.  AirOcare believes that the DIP Lender's proposal

is the best, indeed the only, financing available and that the terms and conditions of the DIP Facility are fair and reasonable under the circumstances.

33.    As for the fourth factor, the proposed financing is in the best interest of the estate and creditors because without it, AirOcare would fail, could not reorganize, and its ability to maximize revenue produced by the Patent would be compromised, potentially leaving nothing for creditors.

34.    Based upon the record before the Court, the terms of the DIP Facility have been negotiated in good faith and at arm's length between AirOcare and the DIP Lender. Accordingly, the fifth factor is also satisfied.

35.    Finally, the last two factors are also satisfied because no other source of financing exists on terms more favorable than those offered by the DIP Lender, and there are no known better offers or other financing proposals before the Court.

36.    The DIP Lender should also be granted the benefits of § 364(e) of the Bankruptcy Code which provides that any reversal or modification on appeal of the approval of the financing sought herein will not render the financing invalid as to amounts advanced before such reversal or modification.  To the extent that any of the provisions of an order approving the DIP Facility are later modified, vacated, stayed or terminated by subsequent order of this or any other court, the DIP Lender should be fully protected with respect to any amounts previously disbursed under the DIP Facility.

## NOTICE WITH RESPECT TO DIP ORDER

37.    Pursuant to Bankruptcy Rule 4001, AirOcare respectfully requests that it be authorized to provide notice of the hearing on this Motion by serving a copy of the Motion, the DIP Facility, the Budget and the accompanying proposed order, a copy of which is attached

hereto as Exhibit D, upon: (a) the Office of the United States Trustee; (b) the twenty (20) largest unsecured creditors of AirOcare; (c) the DIP Lender; (d) all parties who have filed and served notices of appearances requesting service of pleadings in this case as of the day prior to the service date; and (e) all other known secured lenders.

## WAIVER OF MEMORANDUM OF POINTS AND AUTHORITIES

38.     This Motion includes citations to applicable statutory authority and a discussion of their application to this Motion.  AirOcare submits that such citations and discussion satisfy the requirement imposed by Rule 9013-1 of the Local Bankruptcy Rules for the Eastern District of Virginia that this Motion be accompanied by a separate memorandum of law in support of this Motion.

## NO PREVIOUS REQUEST

39.     No previous motion to approve post-petition financing has been made by AirOcare to this or any other court.

## CONCLUSION

WHEREFORE, AirOcare, Inc., Debtor and Debtor-in-Possession, respectfully requests the following relief: (i) approval of this Motion, (ii) entry of the proposed order attached hereto as Exhibit D; and (iii) grant such other and further relief as is just and equitable.

Dated: August 5, 2010

*/s/ Lawrence A. Katz*
Lawrence A. Katz  (VSB No. 47664)
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182
Telephone:  (703) 760-1600
Facsimile:  (703) 821-8949
lakatz@venable.com

*Counsel to AirOcare, Inc.,*
*Debtor and Debtor in Possession*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 5th day of August, 2010, a copy of the foregoing

Motion of Debtor AirOCare, Inc. for Order Authorizing Debtor-in-Possession to Obtain Secured

Post-Petition Financing Pursuant to §§ 105 and 364 of the Bankruptcy Code and Bankruptcy

Rules 2002, 4001, and 9014 was sent, via first class U.S. mail postage prepaid or electronic

transmission, to the parties on the attached service list.


*/s/ Lawrence A. Katz*
Lawrence A. Katz

Christine N. Johnson
Protas, Spivok & Collins, LLC
4330 East West Highway
Suite 900
Bethesda, MD 20814

Grupo Rolo Mexico S De R. I. DE
Avenida Revolucion NO 809
Jardin Espanol, Monterey
Nuevo Leon, MEXICO

Allied Electronics
7151 Jack Newell Blvd. South
Fort Worth, TX 76118

Mid-South Electronics, Inc.
P.O. Box 1308
Gadsden, AL 35902

BSTCO
1320 East Olympic, Suite 215
Los Angeles, CA 90021

Air Quality Sciences
2211 Newmarket Parkway
Suite 105
Marietta, GA 30067

William Synder
13830 Bronco Place
Germantown, MD 20874

Allied Electronics
Accounts Receivable Department
P.O. Box 2325
Fort Worth, TX 76113-2325

Kara E. Bertoncino
Registered Agent
EMF Properties Group, LLC
120 Towerview Court
Cary, NC 27513

Carlos Lima
Av. Ricardo Lyon 967
Providencia, Santiago, Chile

Internal Revenue Service
Spec. Procedures/Support Staff
P.O. Box 10025
Richmond, VA 23240-0025

Barry Zuckerman
16 Greenwich Park
Boston, mA 02118

Kevin W. Cole
1803 Pillory Drive
Vienna, VA 22182

Washington Dept. of Revenue
P.O. Box 34054
Seattle, WA 98124

Thomas B. Newell
9119 Mill Pond Valley Drive
McLean, VA 22102

Ronald B. Mazie
17216 Blossom View Drive
Olney, MD 20832

Frank Bove
Office of United States Trustee
115 S. Union Street, Room 210
Alexandria, VA 22314

Key Electronics
2533 Centennial Blvd.
Jeffersonville, IN 47130

Amco Insurance Co.
John B. Hook, Esq.
Long & Levit LLP
465 California Street, 5th Floor
San Francisco, CA 94104

Barry Gossett
490 South River Landing
Edgewater, MD 21037

Firebreak Partners, LLC
1061 Vista Drive
Mc Lean, VA 22102

United Healthcare Insurance
Dept. CH
10151 Palatine
Palatine, IL 60055

New Jersey Div. of Tax Revenue
P.O. Box 261
Trenton, NJ 08646

ARC, LLC
44330 Mercure Circle
Suite 150
Dulles, VA 20166