**Alan Rosenblum, Esq.**
Virginia Bar #19973
**ROSENBLUM & ROSENBLUM, L.L.C.**
228 South Washington Street, Suite 300
P. O. Box 320039
Alexandria, Virginia 22320
Counsel for Robert D. McDonald

UNITED STATES BANKRUPTCY COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

In re: )
 )  Case No. **10-14519-RGM**
 **AirOcare, Inc.**, )  Chapter 11
 Debtor. )
 )

## MEMORANDUM IN SUPPORT OF OBJECTION BY ROBERT McDONALD TO DEBTOR'S MOTION FOR APPROVAL OF THE ADEQUACY OF PROPOSED DISCLOSURE STATEMENT

**Robert D. McDonald**, by counsel, hereby files his Memorandum in support of his Objection to the adequacy of Debtor's proposed Disclosure Statement. Mr. McDonald is a shareholder of AirOcare, Inc. ("the Company") holding 2,560,001 shares of AirOcare Common Stock, a "former" officer, director and employee of AirOcare, Inc. with extensive knowledge of the business and technology of the Company and the holder of two current claims against the Company for back wages and indemnification. The Disclosure Statement filed by the current officials of the Company is deficient as a matter of law and fact, is materially misleading and contains material false information. Clarification and correction of the Disclosure Statement submitted <u>is critical</u> to the decisions that need to be made on the adequacy of the plan and in support states:

### Legal Standard

A disclosure statement must contain adequate information for creditors and shareholders to make an *informed judgment* about a plan of reorganization. *See In re Scioto Valley Mortgage Co.*, 88 B.R. 168, 170 (Bankr. S.D. Oh. 1988).

Section 1125(b) of the Bankruptcy Code requires that a plan proponent provide "adequate information" regarding a debtor's proposed plan of reorganization. Section 1125(a)(1) defines "adequate information" as follows:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan.

See *In re A.H. Robins, Co.*, 880 F.2d 694 (4th Cir. 1989*); Momentum Mfg. Corp. v. Employee Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F. 3d 1132, 1136 (2d Cir. 1994).

Courts have denied approval of a disclosure statement where the allegations contained in the statement were "unsupported by factual information so that voting parties were unable to independently evaluate the merits of the plan." *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 980 (Bankr. N. D. NY 1988) (internal citations omitted). Congress intended the disclosure statement to be the primary source of information that will allow creditors and shareholders to make informed decisions regarding the proposed plan. *In re Scioto*, *supra.*, citing *In re Egan,* 33 B.R. 672, 675 (Bankr. N.D. Ill 1983).

The Court has broad discretion in examining the adequacy of the information contained in a disclosure statement. See *A.H. Robins* at 696 ("The determination of what is adequate information is subjective and made on a case by case basis. This determination is largely within the discretion of the bankruptcy court."). The determination should take into account the expertise and resources, including the advice of outside professionals and relevant information already possessed or publicly available, of the hypothetical investor of each class of

claims or interests from which the debtor intends to solicit acceptance or rejection of the proposed chapter 11 plan. See *In re Zenith Elec. Corp.*, 241 B.R. 92, 99-100 (Bankr. D. Del. 1999).

## Factors Considered by the Court

Bankruptcy courts exercise broad discretion when deciding whether to approve or reject a disclosure statement. Several factors considered by Courts in this regard that are pertinent to this Motion include: In making a determination, courts often look at whether the disclosure statement contains the following types of information:

1. <u>the circumstances that gave rise to the filing of the bankruptcy petition;</u>
2. <u>a discussion of assets available and their value;</u>
3. <u>a summary of what the debtor anticipates to do going forward;</u>
4. where the information used in the disclosure statement came from;
5. a disclaimer stating that no statements or information regarding the debtor, its assets or securities are authorized, other than those included in the disclosure statement;
6. <u>the debtor's condition during its bankruptcy proceeding;</u>
7. claim information;
8. an analysis showing what creditors would receive from the debtor were it liquidated under chapter 7;
9. the accounting and valuation methods used in the disclosure statement;
10. <u>information regarding the debtor's management going forward;</u>
11. a summary of the plan of liquidation or reorganization;
12. a summary of the administrative expenses, including bankruptcy professional fees;
13. a review of the debtor's accounts receivables;
14. financial information necessary to allow a creditor to decide whether to approve or reject

the plan;

15. <u>information regarding the risks being taken by the creditors;</u>

16. the amount expected for recovery through avoidance actions;

17. <u>a discussion of nonbankruptcy litigation;</u>

18. tax consequences of the plan; and,

19. the debtor's relationship with any affiliates.

*Emphasis added. See In re Scioto Valley Mortgage Co. supra.*, 88 B.R. at 170-71.

**Debtor's proposed Disclosure Statement fails to satisfy the requirements of Section 1125(b)**

    **A. AirOcare's Business Operations**
    **B. Events Leading To Chapter 11 Filing.**

There is obvious animosity between what the current "Board" of the Company refers to as the "Former Insiders" and the current Board. In fact a disproportionately large segment of the Disclosure Statement is devoted to this subject and the litany of alleged improprieties committed by Former Insiders.

The "Former Insiders" ran the business of AirOcare from 2003 through a substantial part of 2009. It was a long, productive and, as expected when new scientific frontiers are crossed, full of challenging periods and events, but with many achievements including the Hussmann Ingersoll Rand contract. This contract constitutes one of the principal assets of the company having a potential payout of up to $30 million. This license agreement (misunderstood and mischaracterized in the Disclosure Statement) coupled with the extensive and equally valuable intellectual property of the Company comprised of the acquired patent, several patents pending, provisional patents, trade secrets, specialized and custom scientific and testing equipment, specialized component parts for AirOcare equipment, voluminous scientific studies, new equipment innovations in various states of development and test results as well as technical records assembled by "Former Insider" Terry Woodbridge are ALL important property of the

Company. There is no adequate recitation of the preservation or utilization of this intellectual property in the purported plan. Moreover, we believe these assets have been mishandled and damaged. Upon information and belief, equipment and parts have been damaged and in some cases destroyed, patents are not being adequately defended due to lack of expertise by the current management and much of the intellectual property of the Company is in the hands of Dr. Erik Young who is a creditor of the Company and unlawfully took possession and control of these assets or at least a copy of these assets during his tenure as a member of the Board of Directors of the Company on and after the August 18, 2009 meeting referred to so often and erroneously in the Disclosure Statement.

Further the continued involvement of Mr. Woodbridge in preserving and enhancing the value of AirOcare for all creditors and shareholders is highly recommended as more fully set out hereafter. The current Board of Directors of AirOcare, Inc. failed to pay and unlawfully terminated Mr. Terry Woodbridge for his work at the Company after the August 18, 2009 meeting. As a consequence, Mr. Woodbridge found himself in dire financial circumstances as the sole wage earner for his family. On information and belief, Mr. Woodbridge asked the Board of AirOcare to loan him funds and offered to pledge his stock (at that time 1,481,917 shares of Common Stock). The Board refused and Mr. Woodbridge in desperation offered to sell 1,000,000 shares of his stock to them for 5 cents per share. Prior to that offer AirOcare common shares sold for between $ 1.00 and $1.25 per share. Mr. Apton and Mr. Wells secretly agreed to buy that stock, each purchasing 500,000 shares for a total payment of $50,000. Mr. Apton later, when Mr. Woodbridge asked him to purchase his remaining 481,917 shares, paid Mr. Woodbridge 2 ½ cents per share or approximately $12,048.00. Mr. Wells and his wife already owned 500,000 preferred shares at a cost of $500,000.00 and Mr. Apton owned 25,000 common shares that he previously paid $25,000.00 to purchase.

Mr. Wells and Mr.Aptons actions were well known to Mr. Bersoff and Mr. DeWitt and tacitly endorsed by them. This fact was not revealed to shareholders and shareholders were not offered the opportunity to purchase a proportionate share of this amount. No excuse is adequate to legally or equitably justify these instances of potential insider trading. Moreover, Mr. Wells told Mr. McDonald and Mr. Chambers that he and Mr. Apton "kept it quiet" so that they could sell stock to investors at a higher value.

The LIST OF EQUITY SECURITY HOLDERS in the Proposed Disclosure Statement therefore materially misstates the totals owned. Mr. Woodbridge currently owns no shares of AirOcare stock unless the Court orders all stock returned to him. Further Mr. Apton's shares should be increased by 481,917 shares for a total of 1,006,917 shares for which he paid a total of $62,048.

The reference in the Proposed Disclosure Statement to Shares owned by David Hass which are listed as "Disputed" in the Proposed Disclosure Statement is in need of discussion. The Proposed Disclosure Statement refers to these shares at page 11 as follows "This figure includes 2,029,959 common shares held by David Haas which have been the subject of dispute by certain shareholders in the past." These shares are a large percentage of the total common shares of the Company and are not owned or held by David Haas. Only Mr. Ralph Apton, acting without the advice of counsel and erroneously, offered to issue these shares to Mr. Haas. This is but one of dozens of examples of negligence and poor judgment exercised by the current management.

The alleged ownership of shares by David Haas was part of an arrangement between Mr. Stuart Rutchik, a former employee, and Erik Young referenced in the Proposed Disclosure Statement in the context of the "Young Litigation". Upon information and belief, they engineered the August 18, 2009 "shareholder meeting" at which Erik Young was "elected" to the AirOcare Board of Directors although the meeting was not properly called, was unlawfully conducted and

did not have a proper quorum to take action. Upon information and belief Mr. Rutchik will testify that he was "duped" by Mr. Young. Thereafter, knowing that the August 18, 2009 meeting was illegal, the current management promised to have involvement on the Board by the Former Insiders and called a meeting on September 30, 2009 to rectify this situation of illegal action and operation of the Company. However, they reneged on that promise. In the Disclosure Statement there is a vague reference to the September 30, 2009 meeting as held to "confirm" that Mr. McDonald and Mr. Chambers were removed as officers of the Company. In fact the meeting was held knowing that the August 18,2009 meeting actions were illegal. This new management group did not have the power to call such a meeting and materially misstated the purpose of the meeting and other material facts to shareholders. It is questionable and a matter of dispute that this current management including Mr. Eric Wells are the proper and lawful management of the Company. Further, Mr. Eric Wells was never elected to the Board of Directors but now serves as the President and CEO of the Company.

**G. DIP Financing.**

The Disclosure Statement contains only limited information concerning its DIP Financing:

> *After an extensive, nine month effort to find sources of financing or recapitalization, on May 28, 2010, AirOcare entered into a secured lending facility with ARC, LLC ("ARC"). ARC's relationship to AirOcare is that AirOcare's directors hold membership interests of approximately 50% in ARC, with the balance of the membership in ARC being held by non-director AirOcare shareholders (approximately 30%) and unrelated parties (approximately 20%).*

Creditors and other shareholders should be apprised of the names and ownership interest of the owners of ARC to the extent that they are Board members or existing shareholders or otherwise related to such members.

**AIROCARE'S ASSETS AND LIABILITIES**
**Assets**
**AirOcare's Business Assets**.

The Disclosure Statement contains only limited information concerning its principal asset.

> *"The principal assets of AirOcare's business are its rights in the Patent and the Hussmann License Agreement."*
> *"AirOcare expects to generate significant future revenue from the development of its technology and the Patent. The exact nature of these future developments and the amount of revenue that they will generate is impossible to predict with accuracy at this time, however.*
> *Accordingly, all of the distribution scenarios detailed in the Distribution Analysis include no additional revenues from applications of the Patent to fields of use outside the scope of the Hussmann License Agreement."*

AirOcare Patent Rights, actually include:

U.S. Patent #6,503,547, Method for Diffusing Ozone in a Closed Environment;

U.S. Patent Application, Apparatus and Method for Sanitizing Air and Spaces, filed in the

U.S. Patent and Trademark Office ("USPTO") on November 30, 2005; and

Provisional Application, Zero Yield Reactor, filed with the USPTO on February 15, 2007.

In the Disclosure Statement and in the Adversary Proceeding documents the Hussmann / Ingersoll Rand contract is described as follows:

> *"Pursuant to the terms of the Hussmann License Agreement, at the end of the license term, <u>the technology will be the property of Hussmann</u>, but AirOcare retains the right to license its technology for uses other than in the cold chain supply applications.* Disclosure Statement at Page 3.

This statement is incorrect, untrue and evidences an incredible lack of understanding of the intellectual property of the Company and its rights to that technology.

The License Agreement with Hussmann/ Ingersoll Rand states in pertinent part:

> *"This agreement ("Agreement") is entered into as of September 7, 2007 ("Effective Date") by and between AirOcare Inc., a Delaware corporation with offices located at 6110 Executive Boulevard, Suite 240, Rockville, MD 20852 ("AirOcare") and Hussmann Corporation, a Missouri corporation with offices located at 12999 St. Charles Rock Road, Bridgeton, MO 63044 ("Hussmann").*
> *Grant Of License to Patent Related Rights. AirOcare hereby unconditionally and irrevocably grants to Hussmann and its Affiliated Companies, and Hussmann on behalf of itself and its Affiliated Companies hereby accepts, an irrevocable, exclusive, <u>worldwide right and license to practice and use the IRCCT Rights within the Fields of Use,</u> including, without limitation, the right to manufacture, have manufactured, use, market, sell, lease*

*and rent Licensed Products whether alone or for use in Climate Control Products.*
*4.2 Following Expiration of Royalty Period. This Agreement and all obligations of AirOcare hereunder will remain in full force and effect following the expiration of the Royalty Period, it being acknowledged and understood that, upon the expiration of the Royalty Period, <u>the license granted pursuant to this Agreement will be deemed to be a fully paid-up license of Know-How and Improvements within the Fields of Use and in accordance with the terms of this Agreement.</u>*

Rather than selling/alienating the property rights to the technology to Hussmann/Ingersoll Rand and merely retaining a license rights, **AirOcare has full ownership of all such rights subject to this license.** As a consequence, AirOcare has many opportunities to license the technology in other fields of use or to sell the company to a buyer. That could include Ingersoll Rand or many other potential purchasers or licensees.

In the spring of 2008 the AirOcare management/Former Insiders worked with *Citi Capital Strategies* and developed a Confidential Information Memorandum (CIM) on the various business opportunities and technology applications available to AirOcare. This project was supervised by Brian Keane, Managing Director and Head of Investment Banking. Mr. Keane worked extensively with prior management and attended meetings with potential acquirers and licensees. Citi experts had full access to AirOcare materials and finances.

A chart of the business opportunity sectors is set out below with several potential values of AirOcare business inserted from elsewhere in the CIM.

| | |
|---|---|
| Healthcare & Related<br>(over 60,000 potential opportunities, not including the 1 million plus home care opportunities)<br>**$16.3 billion** | - Hospitals<br>- Medical Clinics<br>- Nursing and Assisted Living<br>- Home Care Patients<br>- Doctor and Dental Offices<br>- Labs and Medical Research Facilities<br>- Veterinary Practices |
| Commercial Offices and Buildings<br>(over 850,000)<br>**$43.1 billion** | - Commercial Offices and Buildings<br>- Convention Centers<br>- Shopping Malls<br>- Stadiums and Arenas<br>- Gyms and Health Clubs |
| Education<br>(over 200,000 facilities) | - Day Care Centers<br>- Elementary and High Schools<br>- Colleges and Universities |

| Hospitality (over 50,000 targets) **$14.2 billion** | <ul><li>Hotels and Motels</li><li>Cruise Ships</li><li>Casinos</li><li>Resorts</li></ul> |
|---|---|
| Residential (32 million + allergenic homes) | <ul><li>Condominium Buildings</li><li>Apartment Buildings (Of over 50 Units)</li><li>/Single Family Homes (new construction and existing)</li></ul> |
| Government/Military (over 500,000 target facilities) **$22.4 billion** | <ul><li>Military Ships and Transports</li><li>Military Installations</li><li>Federal, State and Municipal Buildings</li><li>Military Hospitals (field and VA)</li><li>FEMA and HUD Facilities</li><li>Embassies</li></ul> |
| Animal Production (over 400,000 targets) | <ul><li>Hatcheries, Egg Production and Broiler Operations</li><li>Hog Production Facilities</li><li>Dairy Farms</li><li>Horse Farms</li><li>Other</li></ul> |

Current management has not provided any information on opportunities in these global industries. They have stated to the Former Insiders that they do not think there are opportunities in healthcare presumably based on false and mispleading conclusions we believe made by Erik Young.

Probably the greatest opportunity for AirOcare technology not yet exploited is in the Heating, Ventilation and Air Conditioning space.

During 2008 and early 2009 AirOcare Former Insiders built a full scale ventilation testing prototype in the Cary North Carolina Technical Operations Center. Photographs of that testing apparatus are attached as Exhibit A1 and A2 has been disassembled and presuably destroyed. In conjunction with this test system numerous device designs were under review and subject to calibration and validation testing including their ability to destroy mold and bacteria. We have no idea what has been done with this equipment and test results.

This is a matter of critical importance to any negotiations with Ingersoll Rand or other buyers/licensees of the AirOcare technology. It should be noted that Ingersoll Rand acquired Trane Corporation in December 2007 shortly after executing the AirOcare license agreement in a transaction for $10.1 billion. Trane is a global leader in indoor climate control systems, services

and solutions with then expected 2007 revenues of $7.4 billion. Curent management is ill prepared to deal with this sitiuation and opportunity although they have apparently been in active discussions with Ingersoll Rand/Trane.

The technology of AirOcare is extremely valuable if handled properly. That is simply not occurring under this group of purported managers. The Disclosure Statement and Plan are materially deficient in that they <u>completely fail</u> to explain how the Company plans to operate in the future. Rather, there are a handful of only vague references to further developing the Company's technology and pursuing additional business opportunities. However, <u>no information</u> is provided as to how and in what manner the Company is going to achieve these objectives. What resources does the Company have to enable it to pursue these objectives? What are the advancements to the technology that are anticipated and how are these advancements going to be accomplished and scientifically and microbiologically demonstrated as effective and safe? How is the intellectual property of the Company being advanced and protected except for some relatively poor and perfunctory patent amendments not guided by any scientific advisor? What advances in the technology have been undertaken or developed during the 16 months they have controlled the Company? What kinds of additional business are being pursued? None of these critical matters and many others are even discussed. That is for a very good reason. Upon information and belief, the current management plans a quick sale of the Company based on work and achievements by the Former Insiders and has not disclosed the facts to any creditors or shareholders. We demand to know this essential information

In addition, there are numerous other facts that must lead to serious questions as to the ability of the current Company management to formulate and execute a plan. For example:

- The members of current management either lack any background in operating this type of business, or lack the time necessary to properly manage the business due to other business

interests, or both.  This is a highly technical business that requires full time involvement of management and there is no member of the Company's current management that devotes full time to the Company's business.

- The Company's technology center in North Carolina, a very valuable asset of the Company, was dismantled; critical equipment was thrown out, damaged or destroyed by current management; and the Company currently lacks the necessary resources without prior management assistance to engage in further technology development.  In communications to shareholders, the current Board has repeatedly referred to a "Dulles TOC (technical operations center)."   However, no such facility actually exists and the former TOC in North Carolina was closed in early 2010 and dismantled by current management.

The Company has entirely alienated, denigrated and criticized Terry Woodbridge, the Company's prior chief development officer and the person with the greatest knowledge and expertise in the development and use of the technology.  Despite treating Mr. Woodbridge extremely poorly, current Board members have repeatedly implored him to assist the Company with technical development, acknowledging that his input is necessary for any such effort.  Again, without Mr. Woodbridge's involvement, the Company's ability to make any significant advances to the technology is highly doubtful. Messrs. McDonald, Chambers and Woodbridge continue to offer their assistance but so far AirOcare has failed to take advantage of that offer.

There are numerous examples of the failure of the Company's current management to either accurately portray the condition of the Company or to reveal to the shareholders and creditors important information that could affect the ability of shareholders and creditors to accurately assess the capability of current management to handle the business of the Company.   Examples of matters either not known by or misrepresented to shareholders and creditors include the

following:

    Members of the current Board endorsed and promoted Erik Young's alleged election to the Board of Directors despite the fact that Dr. Young was known to have a material conflict of interest <u>and prior management had warned the members of the current Board that Dr. Young's intent was to procure for himself opportunities that were valuable opportunities of the Company</u>. At the shareholders meeting held on September 30, 2009, current management failed to divulge Dr. Young's conflict of interest as the owner of Safe Space) **despite questions from shareholders that specifically questioned the relationship of Safe Space with the Company.** Once Dr. Young became a member of the Company's Board, he attempted to improperly influence the other Board members to grant him rights to AirOcare properties and opportunities to the point that the Board eventually forced Dr. Young to resign. Mr. Ralph Apton was made the CEO of the Company in August 2009 because, as stated by other members of the Board to former management, he was the only person who had the time to devote to the business. However, Mr. Apton was entirely unqualified to operate the business, made numerous serious and damaging mistakes, and was eventually removed from the CEO position in approximately November, 2009 by the current management and was directed to not engage in other activities on behalf of the Company without the prior approval of other Board members. Notwithstanding Mr. Apton's lack of qualifications and capabilities, he remains on the Board to this date. Mr. Edward Bersoff also resigned from the Board in approximately November, 2009, with the result that the sole remaining Board members were Mr. William DeWitt (who owns and operates a landscaping business on a full time basis) and Mr. Apton (who had been removed as CEO). This condition existed for some period of time during which time the Company was effectively without management. Mr. Bersoff subsequently rejoined the Board. Mr. Wells was appointed to the

Board and currently serves as CEO of the Company. Mr. Wells has never been elected to the Board.

- Current management as stated earlier has badly mistreated and alienated Terry Woodbridge, while at the same time acknowledging his importance to Company's business and the advancing of its technology.

- Current management disbanded the North Carolina technical operations center (where Mr. Woodbridge worked) and then implied in communications to shareholders that a new technical operations center had been established in Dulles, Virginia. However, there is no such operations center.

- As is noted above, certain Board members have engaged in insider trading in the purchase of Mr. Woodbridge's stock for minimal value at the same time that they were soliciting investment at greater values from existing shareholders and others.

None of these matters have ever been made known to the Shareholders and Creditors of the Company with the result that the Creditors and Shareholders have been deprived of material information necessary to properly assess the capabilities of current management to operate the Company.

The goal of inventing new technology that would help protect the world's food supply and reduce human exposure to dangerous bacteria and viruses in general was achieved under the "Former Insiders" management. It is now being wasted and callously discarded by the current management to the detriment of the creditors and shareholders.

CONCLUSION

The proposed Disclosure Statement fails to satisfy 1125(b) of the Bankruptcy Code and fails to properly disclose:

- <u>the circumstances that gave rise to the filing of the bankruptcy petition;</u>

- a discussion of assets available and their value;

- a summary of what the debtor anticipates to do going forward;

- the debtor's condition during its bankruptcy proceeding;

- claim information;

- an analysis showing what creditors would receive from the debtor were it liquidated under chapter 7;

- the accounting and valuation methods used in the disclosure statement;

- information regarding the debtor's management going forward;

- financial information necessary to allow a creditor to decide whether to approve or reject the plan;

- the debtor's relationship with any affiliates and insiders;

Dated: January 4, 2011

**Robert D. McDonald**.
By Counsel

   /s/Alan Rosenblum
Alan Rosenblum, Esq.
VSB# 19973
Rosenblum & Rosenblum, LLC
P.O. Box 320039
Alexandria, VA  22320

# CERTIFICATE OF SERVICE

I hereby certify that on this January 4, 2011 a true copy of the foregoing OBJECTION and MEMORANDUM IN SUPPORT OFOBJECTION BY ROBERT McDONALD TO DEBTOR'S MOTION FOR APPROVAL OF THE ADEQUACY OF PROPOSED DISCLOSURE STATEMENT was electronically served on all parties and counsel of record in this matter using the Court's CM/ECF service and sent by first-class mail postage pre-paid to the following parties:

**Frank J. Bove**
Office of the US Trustee
115 S. Union St., Ste. 210
Alexandria, VA 22314
frank.j.bove@usdoj.gov

**Lawrence Allen Katz**
Venable LLP
8010 Towers Crescent Drive
Suite 300
Vienna, VA 22182
lakatz@venable.com

**Kristen E. Burgers**
Venable LLP
8010 Towers Crescent Dr. Suite 300
Vienna, VA 22182-2707
keburgers@venable.com

**Stephen E. Leach**
Leach Travell Britt, PC
8270 Greensboro Drive
Suite 1050
McLean, VA 22102
sleach@ltblaw.com

Securities and Exchange Commission
Philadelphia Regional Office
The Mellon Independence Center
701 Market Street
Philadelphia, PA 19106-1532

Securities and Exchange Commission
Atlanta Regional Office
ATTN: Susan R. Sherrill-Beard, Esq.
3475 Lenox Road, N.E., Suite 1000
Atlanta, GA 30326-1232

Securities and Exchange Commission
100 F Street, N.E.

Washington, DC 20549

          **/s/ Alan Rosenblum**
Alan Rosenblum, Esq.
VSB# 19973
Rosenblum & Rosenblum, LLC
P.O. Box 320039
Alexandria, VA  22320