**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

| | |
|---|---|
| In re: ) | |
| ) | Case No. 10-14519-RGM |
| AIROCARE, INC., ) | |
| ) | (Chapter 11) |
| Debtor. ) | |
| ) | |

**FIRST AMENDED DISCLOSURE STATEMENT FOR CHAPTER 11**
**PLAN OF REORGANIZATION OF AIROCARE, INC.**

VENABLE LLP
Lawrence A. Katz (VA Bar No. 47664)
Frederick W. H. Carter (VA Bar No. 80204)
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182
Telephone: 703-760-1600
Facsimile: 703-821-8949
lakatz@venable.com
fwhcarter@venable.com

*Counsel For Debtor*
*AiroCare, Inc.*

Dated: January 11, 2011

BA3/460387

## <u>LIST OF EXHIBITS</u>

A.         Chapter 11 Plan of Reorganization of AirOcare

B.         List of ARC LLC Members

C.         Distribution Analysis

D.         Class 1 Ballot

E.         Class 3 Ballot

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### (Alexandria Division)

<table>
<tr><td>

In re:

AIROCARE, INC.,

      Debtor.
</td><td>

)
)
)
)
)
)
)
)
</td><td>

Case No. 10-14519-RGM

(Chapter 11)
</td></tr>
</table>

## FIRST AMENDED DISCLOSURE STATEMENT FOR CHAPTER 11
## PLAN OF REORGANIZATION OF AIROCARE, INC.

This first amended disclosure statement (the "Disclosure Statement") has been prepared by AiroCare, Inc. ("AiroCare" or the "Debtor"), to provide disclosure of the Chapter 11 Plan of Reorganization of AirOcare (the "Plan"). AirOcare is the proponent of the Plan. The Plan provides for the reorganization of AirOcare's business and distributions to AirOcare's creditors.

On May 29, 2010 (the "Petition Date"), AirOcare filed a voluntary bankruptcy petition under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Virginia, Alexandria Division (the "Bankruptcy Court"), initiating AirOcare's chapter 11 bankruptcy case (the "Chapter 11 Case"). At all times following the filing of the Chapter 11 Case, AirOcare has retained custody of its assets and has operated its business as a "debtor-in-possession" pursuant to §§ 1107 and 1108 of the Bankruptcy Code. No motion seeking appointment of a trustee or examiner has been filed in the Chapter 11 Case and no unsecured creditors' committee has been appointed by the Office of the United States Trustee.

This Disclosure Statement is intended to aid creditors in making an informed judgment regarding acceptance or rejection of the Plan. If you have any questions regarding the Plan, AiroCare urges you to contact its counsel, Venable LLP, 8010 Towers Crescent Drive, Suite 300, Vienna, Virginia 22182, Att'n: Lawrence A. Katz.

While the Bankruptcy Court has approved this Disclosure Statement as containing "adequate information" to enable you to vote on the Plan, the Bankruptcy Court's approval of the Disclosure Statement does not constitute approval or disapproval of the Plan itself. The Bankruptcy Court will consider approval of the Plan only after completion of voting on the Plan. A copy of the Plan is attached to this Disclosure Statement and is incorporated herein by reference as Exhibit A.

AIROCARE SUPPORTS THE PLAN AND URGES YOU TO VOTE TO ACCEPT THE PLAN BY RETURNING YOUR BALLOT SO THAT IT IS RECEIVED BY LAWRENCE A. KATZ, VENABLE LLP, 8010 TOWERS CRESCENT DRIVE, SUITE 300,

VIENNA, VIRGINIA 22182, BY 5:00 P.M. EAST COAST TIME ON MARCH 1, 2011. <u>BALLOTS MUST BE SENT BY UNITED STATES MAIL OR COMMERCIAL OVERNIGHT DELIVERY AND MAY NOT BE SENT BY EMAIL OR FAX.</u>

No representation concerning AirOcare, its business operations, its property or the value of such property has been authorized except as set forth in this Disclosure Statement. No representations other than those made in this Disclosure Statement should be relied upon in evaluating the Plan.

The information presented in this Disclosure Statement has not been subjected to an external audit. AirOcare and its counsel and advisors cannot warrant the accuracy of the information contained in this Disclosure Statement, although AirOcare has used its best efforts under all of the circumstances to ensure that the information herein is as accurate as possible.

**THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF THE PLAN. CREDITORS ARE URGED TO READ THE ENTIRE PLAN AND THE DISCLOSURE STATEMENT BEFORE VOTING ON THE PLAN.**

## I.	DEFINITIONS

**Unless otherwise indicated by context or otherwise, capitalized terms appearing in this Disclosure Statement have the meanings given to them under Article I of the Plan.**

## II.	HISTORY OF AIROCARE

### A.	AirOcare's Business Operations

AirOcare was originally organized as a limited liability company for the purpose of purchasing and developing technologies for air purification. In the fall of 2004, AirOcare took steps to convert from a limited liability company to a corporation. Specifically, on September 28, 2004, AirOcare filed a certificate of incorporation with the Delaware Secretary of State, resulting in its conversion to a Delaware corporation.

A few days later on October 1, 2004, Robert D. McDonald ("McDonald"), as AirOcare's incorporator, executed an "organizational consent of incorporator," naming himself, William R. Chambers ("Chambers") and Jack W. Prouty ("Prouty") as the initial directors of AirOcare. On the same day, the newly-named directors designated McDonald, Chambers, Prouty, Stuart N. Rutchik ("Rutchik") and Terrance O. Woodbridge ("Woodbridge," and collectively with Chambers, McDonald, Prouty and Rutchik, the "Former Insiders") as the officers of AirOcare by means of unanimous consent.

To further develop the business of AirOcare, on November 1, 2005 the board of directors of AirOcare authorized the purchase of an anti-microbial reactive oxygen species ("ROS") air purification process patent (the "Patent") from a Chilean businessman named Carlos Lima and/or certain companies controlled by Lima (collectively, "Lima"). Lima's technology purifies air by killing airborne microbes. The specific purpose of the purchase was to adapt Lima's technology for markets in the United States. As consideration for assignment of the

Patent, AirOcare gave Lima a promissory note in the amount of $1,000,000. In September of 2007, AirOcare paid Lima $250,000 in cash leaving a balance due of $750,000. The balance was to be paid in 2008, but no further payments were made by AirOcare.

**B.      Events Leading To Chapter 11 Filing.**

Like many start-up businesses, AirOcare suffered cash flow problems. To generate needed revenue, on or about August 16, 2007 AirOcare's board of directors authorized entry into a 10-year license agreement (the "Hussmann License Agreement") with the Hussmann Corporation ("Hussmann"), a subsidiary of Ingersoll Rand. Under the Hussmann License Agreement, Hussmann obtained, among other things, the right to use AirOcare's technology in the "cold chain supply" business which encompasses low temperature food handling and processing.

After execution of the Hussmann License Agreement, Hussmann paid AirOcare $5 million as an initial royalty (the "Initial Royalty"). Additional royalties were to be paid based upon sales performance, subject to minimum quarterly payments and with a cap of $30 million as the maximum royalty that could be paid over the 10-year term of the Hussmann License Agreement.

Pursuant to the terms of the Hussmann License Agreement, at the end of the license term, Hussman shall have a fully paid-up license to the technology, as further defined in the Hussman License Agreement, but AirOcare retains the right to license its technology for uses other than in cold chain supply applications. Hussmann retains the right to terminate the obligation to pay royalties under the Hussmann License Agreement at any time upon notice and with no penalty to Hussmann other than the loss of exclusivity of the use of the technology during the term of the agreement.

Due to the diversion of scarce resources for the personal benefit of the Former Insiders (described in greater detail below), AirOcare remained chronically short of cash despite the increased revenue from the Hussmann License Agreement. To obtain additional operating cash, AirOcare borrowed $200,000 from BB&T Bank ("BB&T") in the Fall of 2008. Four of the five Former Insiders personally guaranteed the BB&T loan.

AirOcare was unable to repay the BB&T loan when it came due in March of 2009. BB&T undertook collection action by filing a lawsuit in the Circuit Court for Montgomery County, Maryland (the "Montgomery County Circuit Court") on July 6, 2009, docketed as <u>Branch Banking and Trust Company v. AirOcare, Inc.</u>, Case No. 316347V (the "BB&T Lawsuit"). The BB&T Lawsuit sought judgment against AirOcare for the amounts then due under the BB&T loan and also sought judgment against the four individual guarantors, Chambers, McDonald, Prouty and Rutchik.

On July 13, 2009, the Montgomery County Circuit Court entered judgment by confession against AirOcare and the guarantors in the amount of $146,343.22, plus interest in the amount of $2,011.65, for a total of $148,354.87, plus attorneys' fees. Based upon the judgment, BB&T successfully sought issuance of a writ of garnishment against Ingersoll Rand, Hussmann's parent company, on November 5, 2009.

On January 26, 2010, the Montgomery County Circuit Court entered a judgment of garnishment against Ingersoll Rand in the amount of $125,000, which amount represented the royalty due from Hussmann under the Hussmann License Agreement for the first quarter of 2010. Due to the issuance of the garnishment, Hussmann ceased making payments under the Hussmann License Agreement which, at the time, was the only regular income that AirOcare was receiving.

In addition to the garnishment, Hussmann also suspended payment of royalties under the Hussmann License Agreement due to alleged representations made by Lima that AirOcare was not the owner of the Patent and did not have authority to enter into the Hussmann License Agreement.

In February of 2009, shortly before AirOcare's default in its obligations to BB&T, Prouty and Rutchik were terminated from AirOcare's employment due to lack of funds to pay their salaries. Prouty and Rutchik, concerned about the status of AirOcare and their own personal liability for AirOcare obligations, including unpaid Federal withholding taxes and the guaranty of the BB&T loan, began to share their concerns about corporate finances and operational difficulties with other AirOcare shareholders.

As a result, a special meeting of AirOcare's shareholders was held on August 18, 2009, at which time details of AirOcare's financial performance were provided to the shareholders. At the special meeting, shareholders voted to remove McDonald and Chambers as directors of the company and elected a new board of directors. On August 25, 2009, Chambers and McDonald also were removed as officers of AirOcare. On September 30, 2009, another shareholder meeting was held at which time the removal of McDonald and Chambers as directors was re-affirmed.

By November of 2009, the remaining Former Insider, Woodbridge, was removed from his position as an officer of AirOcare and the last of AirOcare's employees was laid off shortly thereafter due to a lack of funds for payroll or operations. In January of 2010, AirOcare's books and records were moved to office space owned by Eric Wells, the President and CEO of AirOcare, located in Dulles, Virginia.

In February of 2010, Dr. Erik Young ("Young") filed a lawsuit against McDonald, Chamber, Prouty and AirOcare docketed as <u>Young, et al. v. McDonald, et al.</u>, Case No. 327252-V in the Montgomery County Circuit Court (the "Young Lawsuit"). In the Young Lawsuit, Young, himself a former director of AirOcare, alleged that the defendants had induced him into investing in AirOcare through misrepresentations of fact and had violated Maryland securities laws. On May 24, 2010, Young filed an amended complaint adding his wife and a family-controlled company as additional plaintiffs. AirOcare filed a responsive pleading to the amended complaint and prepared to respond to discovery which had been served by the Young plaintiffs.

Litigation against AirOcare was also pending in Indiana. In 2009, a manufacturer named Key Electronics filed a complaint against AirOcare in the United States District Court for the Southern District of Indiana, docketed as <u>Key Electronics, Inc. v. AirOcare, Inc.</u>, Case No. 4:09-CV-033 SEB-WGH (the "Key Lawsuit") claiming amounts due under a contract. AirOcare

retained the Indianapolis law firm of Wooden & McGlaughlin LLP ("W&M") and in the Spring of 2010 was preparing to respond to discovery that had been served by Key Electronics.

Due to the lack of available funds to defend the Young Lawsuit and the Key Lawsuit and due to the cessation of royalty payments under the Hussmann License Agreement, AirOcare sought protection under chapter 11 of the Bankruptcy Code. With substantial deposition discovery scheduled for June of 2010, AirOcare filed a voluntary petition under chapter 11 on May 29, 2010 (the "Petition Date") in the Bankruptcy Court initiating the Chapter 11 Case.

## III.    EVENTS IN AIROCARE'S CHAPTER 11 CASE

### A.    Schedules, Statement of Financial Affairs and Meeting of Creditors.

On June 14, 2010, AirOcare filed its Schedules and Statement of Financial Affairs [Docket Nos. 14 and 16, respectively]. Eric Wells, President and CEO of AirOcare, also attended and testified at the meeting of creditors held on July 8, 2010.

### B.    Professionals

AirOcare has retained various professionals in this case. AirOcare filed an application to retain Venable LLP ("Venable") as its general bankruptcy counsel on June 17, 2010 [Docket No. 21]. The application sought retention of Venable as AirOcare's general bankruptcy counsel and also sought approval of the retainer held by Venable in the amount of $94,564.08. Venable's employment application was approved by an order of the Bankruptcy Court entered on July 17, 2010 [Docket No. 53].

Prior to the Petition Date, Venable had provided services to Hussmann's parent corporation, Ingersoll Rand, in totally unrelated matters. Accordingly, AirOcare filed an application to retain Leach Travell Britt ("LTB"), as its special counsel on June 25, 2010 [Docket No. 26] to represent it in matters relating to Hussmann and/or Ingersoll Rand. The Bankruptcy Court approved LTB's retention as special counsel by an order entered on July 15, 2010 [Docket No. 54]. Funds in the amount of $25,000 held by Venable as part of its retainer was transferred to LBT to be held as a retainer pursuant to the order authorizing the LBT's retention.

AirOcare also filed applications to retain other necessary professionals. The McGinn Intellectual Property Group PLLC ("McGinn") represented AirOcare prior to the Petition Date in intellectual property matters. Venable prepared and filed an application to employ McGinn on July 9, 2010 [Docket No. 48]. The application to employ McGinn was approved by the Bankruptcy Court through an order entered on July 30, 2010 [Docket No. 65].

AirOcare also required representation for the claims underlying the Key Lawsuit. Accordingly, Venable prepared and filed an application to retain W&M as special counsel for that litigation on August 18, 2010 [Docket No. 76]. The Bankruptcy Court approved the employment of W&M through an order entered on September 15, 2010 [Docket No. 95].

AirOcare also required the assistance of an accounting firm to advise it on tax matters, to assist it in becoming compliant with the filing of all needed Federal and state tax returns and to assist AirOcare in the preparation of its monthly operating reports. AirOcare selected MillerMusmar CPAs ("MillerMusmar") as its accountants and Venable prepared and filed an application for the approval of MillerMusmar's employment on July 9, 2010. MillerMusmar's employment was approved by a Bankruptcy Court order entered on July 30, 2010 [Docket No. 64].

## C.    Young Litigation.

On June 18, 2010, a little more than two weeks after the Petition Date, Young filed a motion seeking relief from the automatic stay (the "Young Stay Relief Motion") [Docket No. 23]. The Young Stay Relief Motion sought relief from the stay to allow the Young Lawsuit to immediately proceed in Montgomery County Circuit Court.

Shortly afterward on June 29, 2010, AirOcare removed the Young Lawsuit to the United States Bankruptcy Court for the District of Maryland which was then docketed as an adversary proceeding. See Young v. McDonald, et al., Adversary Proceeding No. 10-00502 WIL (the "Young Adversary Proceeding"). The next day, June 30, 2010, AirOcare file a motion to transfer venue of the Young Adversary Proceeding to the Bankruptcy Court. AirOcare also filed a response opposing the Young Stay Relief Motion.

By agreement of the parties, the Young Stay Relief Motion was continued several times in order to provide Young and AirOcare with the time needed to explore settlement. A settlement was ultimately reached, pursuant to which it was agreed that the Young plaintiffs would hold a single allowed, general unsecured claim in the principal amount of $1,530,000 plus pre-petition interest. Additionally, the parties agreed that Young individually would hold a single unsecured claim in the amount of $17,500, plus pre-petition interest. The settlement also provided that any plan proposed by AirOcare would provide for payment of post-petition interest on Young's claims at the legal rate and also provided that the Young parties would retain their Equity Interests in AirOcare under any AirOcare-proposed chapter 11 plan.

The settlement also provided that the parties would not release any claims that they may hold against any of the Former Insiders. Also, in the event that either the Young plaintiffs or AirOcare recover any Equity Interests in AirOcare held by the Former Insiders, such recovered Equity Interests would be divided between the parties. Specifically, the settlement provided that the first 500,000 of recovered Equity Interests would be evenly divided by the parties regardless of whether they are recovered by AirOcare or the Young plaintiffs. Should more than 500,000 shares be recovered, 80% of the excess in recovered shares would be distributed to AirOcare and 20% to the Young plaintiffs.

AirOcare filed a motion seeking approval of the Young settlement with the Bankruptcy Court on October 15, 2010 [Docket No. 109]. No objections were filed and the Young settlement was approved by the Bankruptcy Court at a hearing held on November 9, 2010. The settlement approval order was entered on November 15, 2010 [Docket No. 120].

**D. The Former Insider Litigation.**

Following the execution of the Hussmann License Agreement in 2007, some or all of the Former Insiders began to systematically divert assets of AirOcare for their own personal benefit. Even though AirOcare's financial resources were scarce, the Former Insiders used AirOcare as a personal cash-box. Specifically, AirOcare's investigations found that the Former Insiders (i) paid themselves excessive compensation, (ii) used AirOcare monies to pay for or reimburse their own personal expenses, and (iii) attempted to establish a benefits trust (the "Trust") for the purpose of providing themselves and family members with lavish insurance benefits and personal loans of $100,000 each. The Former Insiders intended the insurance policies to continue to provide benefits following a sale of AirOcare's business, if such a sale could be arranged. The transfers to the Former Insiders and the Trust were in excess of $800,000 and left AirOcare with an unreasonably small capital for its business and unable to pay its debts as they came due.

Accordingly, on November 12, 2010, AirOcare filed an adversary proceeding in the Bankruptcy Court against the Former Insiders and against the alleged current trustee of the Trust, Ronald B. Mazie ("Mazie"), as a nominal party. See AirOcare v. McDonald, et al., Adversary Proceeding No. 10-01481 RGM (the "Former Insider Litigation"). The summonses were issued on November 16, 2010 and served on November 17, 2010. Answers were due on December 16, 2010, though this deadline has been extended as to certain defendants. AirOcare expects to negotiate a scheduling order with the various defendants following the filing of answers by all defendants.

**E. The Lima Settlement.**

All outstanding disputes with Lima have also been resolved by negotiations. AirOcare and Lima reached an agreement whereby (a) Lima and AirOcare reaffirmed and acknowledged that Lima had assigned all right, title, and interest in and to the Patent to AirOcare; (b) Lima and AirOcare reaffirmed and acknowledged that AirOcare owes Lima individually the sum of $750,000.00 on account of Lima's assignment of the Patent to AirOcare; and (c) AirOcare agreed to release Lima from any and all claims and causes of action that exist or might exist relating to any alleged or actual disparagement by Lima of AirOcare's right, title, and interest in and to the Patent.

A motion seeking approval of the settlement agreement between AirOcare and Lima was filed by AirOcare through its special counsel LTB on September 3, 2010 [Docket No. 90]. A hearing on the settlement motion was held on September 28, 2010 and an order approving the settlement with Lima was entered on September 30, 2010 [Docket No. 104].

**F. The BB&T Settlement.**

Prior to the Petition Date, the BB&T litigation had been at a standstill, during which time the parties tried to negotiate, but could not reach, a final resolution. In August of 2010, AirOcare and BB&T reached an agreement whereby BB&T agreed to accept the amount of $125,000, to be paid by Hussmann pursuant to the Hussmann License Agreement, in full satisfaction of its claims against AirOcare. BB&T also agreed to withdraw its Proof of Claim.

A motion seeking approval of the BB&T settlement was filed by AirOcare through its special counsel on August 23, 2010 [Docket No. 80]. A hearing on the settlement motion was held on September 14, 2010 and an order approving the settlement with BB&T was entered on September 17, 2010 [Docket No. 98]. The $125,000 due to BB&T under the settlement has been paid and the BB&T Proof of Claim was withdrawn on October 26, 2010 [Docket No. 114].

## G.    DIP Financing.

After an extensive, nine month effort to find sources of financing or recapitalization, on May 28, 2010, AirOcare entered into a secured lending facility with ARC, LLC ("ARC"). ARC's relationship to AirOcare is that AirOcare's directors hold membership interests of approximately 50% in ARC, with the balance of the membership in ARC being held by non-director AirOcare shareholders (approximately 30%) and unrelated parties (approximately 20%). The identity and interests of the ARC members is detailed on the attached Exhibit B.

The May 28, 2010 loan documents provided for a secured line of credit of up to $1,000,000 to AirOcare (the "DIP Facility"). Of the amount available under the DIP Facility, $300,000 was funded on May 28, 2010, the day before the Petition Date.

Of the $300,000 in loan proceeds, $137,492.10 was used to repay bridge loans which had been advanced to AirOcare by certain insiders. AirOcare also used $150,000 of the borrowed funds to pay for pre-petition legal fees owed to Venable and to pay a retainer for services to be rendered in this bankruptcy case.

Prior to the Petition Date, Venable applied $55,435.92 of the $150,000 to pay all of its outstanding and unpaid prepetition fees and expenses incurred in representing AirOcare. Venable's representation of AirOcare began on May 7, 2010 and the pre-petition amounts paid were for services all of which were rendered in May of 2010. The balance of funds in the amount of $94,564.08 was held by Venable as a retainer for services to be rendered in this bankruptcy case.

In addition, $12,507.90 of the $300,000 advanced under the DIP Facility was used to pay certain trade creditors prior to the Petition Date for goods and services obtained by AirOcare in the ordinary course of business. The balance of the borrowed funds, $11,235.77, remained in AirOcare's DIP account (the "DIP Account") on the Petition Date and was the only cash available to AirOcare for operations on the Petition Date.

The DIP Facility is documented by a Secured Note and a Security Agreement. Under the terms of the Security Agreement, AirOcare granted ARC a security interest in substantially all of its Assets including the Patent and the Hussmann License Agreement.

On August 4, 2010, AirOcare filed a motion seeking approval of the DIP Facility as post-petition secured credit to allow it to access the balance of funds available under the DIP Facility (the "DIP Financing Motion") [Docket No. 70]. In the DIP Financing Motion, AirOcare sought authority to borrow up to the maximum $700,000.00 amount remaining under the DIP Facility. The DIP Financing Motion was set for hearing on August 24, 2010 and an order

approving the DIP Facility was entered by an order entered on August 30, 2010 [Docket No. 86].

**H.     Business Development**

Due to the Court-approved settlement reached by AirOcare and Carlos Lima, all issues relating to the  rights in AirOcare's intellectual property have been laid to rest.  Likewise, pursuant to the BB&T settlement, the $125,000 garnishment served by BB&T Bank on Hussman has been paid.  As a result of these post-petition events, the revenue stream under the Hussman License Agreement is once again flowing.

With this renewed income stream, AirOcare has entered into an agreement with Prototype Production, Inc. ("PPI").  PPI is presently hosting the Debtor's technical research and prototype development center in Dulles, Virginia.   PPI is working with the Debtor's management to further develop the Debtor's technology to explore opportunities which may lead not only to increased business with Hussman and its parent Ingersoll Rand, but also to the development of new products in fields of use outside the scope of the Hussman License Agreement.  The developments with regard to Ingersoll Rand and PPI are recent and ongoing in nature.

**I.     Unexpired Leases and Executory Contracts**

Prior to the Petition Date, AirOcare had been a tenant under two leases for commercial office space located at 132 and 134 Towerview Court, Cary, North Carolina (the "Towerview Leases") which is where certain of AirOcare's operations were conducted.  AirOcare had vacated the premises leased under the Towerview Leases in approximately February 2010.  These leases may have been deemed terminated under North Carolina law.  Nevertheless, in an abundance of caution AirOcare filed motions to reject the Towerview Leases [Docket Nos. 68 and 84].  The Bankruptcy Court entered an order rejecting the 132 Towerview Court lease on August 30, 2010 [Docket No. 87] and rejecting the 134 Towerview Court lease on September 20, 2010 [Docket No. 101].

AirOcare also evaluated its current lease for office space located at 44330 Mercure Circle, West Dulles, Virginia (the "West Dulles Lease").  AirOcare concluded that the West Dulles Lease had been entered into postpetition and in the ordinary course of business and therefore it did not need to take action to assume the West Dulles Lease.

**J.     Plan and Disclosure Statement**

This Disclosure Statement accompanies AirOcare's Plan.  Both the Plan and this Disclosure Statement were filed with the Bankruptcy Court on November 24, 2010.  The Plan provides for payment of all administrative expense claims and payment in full to all holders of AirOcare's Secured, Priority and Unsecured Claims.  The Plan will be funded with income generated by AirOcare's post-petition operations.  The Plan will also be funded by the proceeds of any causes of action pursued by AirOcare.

## IV.  AIROCARE'S ASSETS AND LIABILITIES

REFERENCE IN THIS DISCLOSURE STATEMENT TO THE AMOUNT OF ANY CLAIM IS NOT AN ADMISSION OR ACKNOWLEDGEMENT OF THE ALLOWED AMOUNT OF SUCH CLAIM, NOR IS REFERENCE TO THE VALUE OF ANY ASSET OR AMOUNT OF ANY CAUSE OF ACTION AN ADMISSION OF SUCH VALUE OR AMOUNT.  NO CREDITOR SHOULD VOTE FOR THIS PLAN ON THE ASSUMPTION THAT ITS CLAIM WILL NOT BE SUBJECT TO OBJECTION.

### A.  Assets

**AirOcare's Business Assets**.   The principal assets of AirOcare's business are its rights in the Patent and the Hussmann License Agreement.  However, AirOcare also has various patent applications outstanding.

Pursuant to an Order of this Court entered on July 30, 2010 [Docket No. 65], McGinn Intellectual Property Law Group, PLLC has been providing services as AirOcare's intellectual property counsel with regard to AirOcare's patent and various domestic and foreign patent applications.  The following summarizes those applications and provides a brief description of the nature of the subject process and/or equipment as well as a brief description of the posture of the various applications with the relevant patent offices.  All of filings relating to the various patent applications are up-to-date and all needed maintenance fees have been paid.

| AirOcare Docket No.[1] | Intellectual Property/Patent | Patent Application or Number |
|---|---|---|
| AIR.010 | Method for Diffusing Ozone in a Closed Environment | US Patent 6,503,547<br><br>Second patent maintenance fee paid July 6, 2010; final maintenance fee due on July 7, 2014. |
| AIR.001 | US Patent Application<br><br>The claimed invention is directed to an apparatus for sanitizing air.  The apparatus includes a reaction unit for generating ozone and reactive oxygen species, the reactive oxygen species comprising at least one of singlet oxygen, superoxide, hydrogen peroxide, hydroxyl radical, and peroxynitrite, through use of a corona discharge, from oxygen in air received in the reaction unit to be sanitized.  The reaction unit is configured to discharge the generated ozone with the air from the reaction unit.  Accordingly, airborne | Serial no. 11/289,363<br><br>Application is pending.  A final Office Action was issued on December 1, 2010.  Response to be filed with the to the Office Action on or before February 1, 2011. |

---

[1] Docket numbers have been assigned by AirOcare's Court-approved intellectual property counsel, McGinn Intellectual Property Law Group, PLLC, for organizational and tracking purposes.

| | | |
|---|---|---|
| | contaminants in the received air are neutralized by the generated reactive oxygen species before the air is discharged from the reaction unit. | |
| AIR.004 | US Patent Application<br><br>The claimed invention is directed to an apparatus for sanitizing air. The apparatus includes a generating unit that generates ozone and reactive oxygen species from oxygen in air, received by said generating unit, to be sanitized and a cancellation unit that cancels at least a portion of the ozone before the air is returned to an area to be sanitized. Accordingly, airborne contaminants in the received air are neutralized by the generated reactive oxygen species before the air is discharged from the reaction unit. | Serial no. 12/032,398<br><br>Application is pending. Amendment and Request for Continued Examination was filed on December 17, 2010. Currently awaiting USPTO's next action. |
| AIR.001CIP | US Patent Application<br><br>Apparatus for sanitizing air. The apparatus includes a reaction unit, configured to be mounted in an air duct, for generating reactive oxygen species from oxygen in air received in the reaction unit to be sanitized. | Serial no. 12/453,276<br><br>Application filed on May 5, 2009. Currently awaiting first action from USPTO. |
| AIR.001CIP2 | US Patent Application<br><br>Apparatus for sanitizing air. The apparatus includes a reactor, for generating reactive oxygen species from oxygen in air received in the reactor to be sanitized. The reactor includes at least one reaction chamber and a reactor clamp configured to support the at least one reaction chamber. | Serial no. 12/889,092<br><br>Application filed on September 23, 2010. Received Notice to File Missing Parts. Inventor signatures to be collected. |

| | **Foreign Patent Applications<br>(All of which seek foreign patents for the technology docketed as AIR.001 above)** | |
|---|---|---|
| AIR.001JP | Japanese Patent Application | Application no. 2008-543266<br><br>Substantive examination requested on July 15, 2009. |

| AIR001CA | Canadian Patent Application | Application no. 2631499<br><br>Application is pending. |
|----------|------------------------------|-------------------------------------------------|
| AIR.001EU | European Patent Application | Application no. 06788352.0<br><br>Written Opinion and Search Report received. Response due on April 4, 2011. |
| AIR.001CH | Chinese Patent Application | Application no. 2006-80501085<br><br>Application is pending. |
| AIR.001IN | Indian Patent Application | Application no. 4634/DELNP/2008<br><br>Application is pending. |
| AIR.001RK | Korean Patent Application | Application no. 2008-7015820<br><br>Deadline for requesting substantive examination is July 25, 2011. |

**The Former Insider Litigation and the Avoidance Actions**. Pursuant to § 6.4 of the Plan, all Causes of Action of the estate will vest in the Reorganized Debtor upon confirmation of the Plan. Causes of Action include, without limitation, actions to avoid and recover preferential transfers and fraudulent conveyances, pursuant to §§ 544, 547, 548, and 550 of the Bankruptcy Code.

AirOcare has performed an analysis of potential claims and avoidance actions. As of the date of this Disclosure Statement, the only material claims or avoidable transfers identified for potential recovery are the claims and avoidable transfers at issue in the Former Insider Litigation. Prior to the Petition Date, AirOcare repaid certain bridge loans that had been made by shareholders to pay certain operating costs of AirOcare. AirOcare has analyzed these transfers and the applicable defenses and has determined that pursuit of their avoidance and recovery is unwarranted. Other than these claims, AirOcare is unaware of any other claims or transfers which may be recovered or avoided as preferential or fraudulent transfers.

**IN NOT DESCRIBING ANY POTENTIAL CAUSE OF ACTION HEREIN, AIROCARE DOES NOT INTEND TO INDICATE THAT ANY CAUSE OF ACTION NOT SPECIFICALLY MENTIONED DOES NOT EXIST. THE FAILURE TO**

INCLUDE ANY DESCRIPTION OF A SPECIFIC CAUSE OF ACTION, INCLUDING ANY SPECIFIC AVOIDANCE ACTION, IN THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSIDERED AS AN ADMISSION OR ACKNOWLEDGMENT BY AIROCARE THAT ANY CAUSE OF ACTION DOES NOT EXIST.  INVESTIGATIONS OF POTENTIAL CAUSES OF ACTION HAVE NOT BEEN COMPLETED.

ALL SUCH CAUSES OF ACTION, INCLUDING THOSE WHICH ARISE BY VIRTUE OF CHAPTER 5 OF THE BANKRUPTCY CODE, WILL VEST IN THE REORGANIZED DEBTOR AND MAY BE PROSECUTED BY THE REORGANIZED DEBTOR AFTER CONFIRMATION OF THE PLAN.  NO CREDITOR SHOULD VOTE TO ACCEPT OR REJECT THE PLAN BASED UPON THE FAILURE OF AIROCARE TO DESCRIBE OR ASSERT ANY CAUSE OF ACTION NOT OTHERWISE DISCLOSED HEREIN.  LIKEWISE, THE REORGANIZED DEBTOR WILL CONTINUE TO HAVE THE AUTHORITY TO OBJECT TO THE ALLOWANCE OF CLAIMS.

**B.      Liabilities**

**1.      Administrative Expense Claims**.  On October 14, 2010, LBT filed its first interim application for compensation [Docket No. 107].  The amount of fees sought by LBT in its first interim application was $25,039.50.  LBT also sought reimbursement of $147.79 in actual, necessary expenses incurred in the course of its representation of AirOcare.  LBT's first interim fee application was approved by the Bankruptcy Court at a hearing held on November 9, 2010 and an order approving interim allowance of the requested fees and expense reimbursement was entered on November 15, 2010 [Docket No. 121].

AirOcare estimates that a total of $550,000 in Allowed Administrative Expense Claims will be payable as of the Effective Date.

**2.      Prepetition Claims.**  Bar dates for the filing of proofs of claim have been established in this case.  The last day to file claims for held by claimants other than governmental units was October 6, 2010.  The last day for the filing of claims held by governmental units is November 25, 2010.  The figures used in the following paragraphs are based upon filed proofs of claim and the Schedules filed by AirOcare, as they have been amended.

The following table describes the scheduled amount of claims in this case, whether disputed or undisputed.  The table also provides a breakdown of these claims according to their priority.

AirOcare is in the process of reviewing claims and preparing objections. AirOcare expects that certain claims will be disallowed or reduced from the filed amount through the claims resolution process.  The table below represents AirOcare's best estimate of the total amount of Allowed Claims in each class after the claims reconciliation process is complete.  The table classifies claims in accordance with the classifications established by the Plan as described more fully *infra.*

| | |
|---|---|
| Secured Claim (ARC) | $3,000,000.00[2] |
| Priority Claims | $ 168,065.47 |
| General Unsecured Claims | $3,097,430.21 |

**3.     Interests.**  AirOcare's outstanding stock is divided into two classes – common stock and Class A preferred shares.  A total of 18,969,413 shares of common stock are currently outstanding.  This figure includes 2,020,959 common shares held by David Haas which have been the subject of dispute by certain shareholders in the past. There are 4,500,000 shares of Class A preferred stock outstanding.  There are also a number of outstanding warrants which may provide for the purchase of additional shares.

## V.     SUMMARY OF THE PLAN

THIS SUMMARY IS MODIFIED IN ITS ENTIRETY BY REFERENCE TO THE FULL TEXT OF THE PLAN.  TO THE EXTENT OF ANY CONFLICT BETWEEN THE TERMS OF THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL CONTROL.

The Plan contemplates that creditors will be paid in full, with Legal Interest, through revenues generated by AirOcare following confirmation of the Plan and possibly the proceeds of litigation.

## A.     Treatment of Administrative Expense Claims

Administrative Expense Claims are unclassified under the Plan.  Each holder of an Allowed Administrative Expense Claim shall receive: (a) to the extent not already paid, a Cash Payment on the later of the Effective Date or the first Business Day after the date that is thirty (30) calendar days after the date on which such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; (b) to the extent Allowed Administrative Expense Claims are incurred in the ordinary course of AirOcare's business and are not yet due and payable upon the Effective Date, Cash Payment in accordance with the terms and conditions of the particular transaction giving rise to such Administrative Expense Claim; (c) to the extent such Claims are Administrative Expense Claims of the United States Trustee for fees pursuant to 28 U.S.C. § 1930(a)(6), a Cash Payment in accordance with the applicable schedule for payment of such fees; or (d) payment on such other terms as may be agreed upon in writing between the holder of such Allowed Administrative Expense Claim and AirOcare; provided, however, that interim and/or final payment of any Allowed Administrative Expense Claims approved by order

---

[2] This figure assumes that the full amount available under the DIP Facility is drawn upon to fund postpetition operations and administrative expenses.  This amount also does not reflect interest which accrues under the Secured Note at the Wall Street Journal prime rate plus one (1) percent.

of the Bankruptcy Court shall be paid at the time of and in accordance with such Bankruptcy Court order.

Requests for payment of Administrative Expense Claims existing as of the Effective Date must be filed with the Bankruptcy Court and served on the Reorganized Debtor no later than thirty (30) days after the Effective Date. Objections to payment of Administrative Expense Claims must be filed with the Bankruptcy Court and served on the Reorganized Debtor, the United States Trustee, and the Administrative Expense Claim applicant by the later of (a) thirty (30) days after the Effective Date, or (b) thirty (30) days after the filing of the request for payment of an Administrative Expense Claim, unless otherwise ordered or extended by the Bankruptcy Court. Notwithstanding anything herein to the contrary, no request for payment of an Administrative Expense Claim need be filed with the Bankruptcy Court for the allowance of (a) an Administrative Expense Claim incurred in the ordinary course of AirOcare's business; or (b) the fees of the United States Trustee arising under 28 U.S.C. § 1930(a)(6).

All Professionals seeking an award by the Bankruptcy Court of a Professional Fee Claim incurred through and including the Effective Date shall, unless otherwise ordered by the Bankruptcy Court, file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is no later than thirty (30) days after the Effective Date. Professional Fee Claims shall be paid by the Debtor pursuant to the provisions in § 2.1 of the Plan with respect to Allowed Administrative Expense Claims generally.

## B.   CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

The Plan provides for the division of Claims and Equity Interests into four classes:

Class 1 consists of Allowed Secured Claims.

Class 2 consists of Allowed Claim entitled to priority of payment under §§ 507 (a)(4), (a)(5), (a)(7) or (a)(8) of the Bankruptcy Code

Class 3 consists of Allowed Unsecured Claims.

Class 4 consists of Equity Interests in AirOcare, including all common and preferred shares and warrants.

## C.   TREATMENT OF CLAIMS AND EQUITY INTERESTS

Pursuant to the Plan, Claims and Equity Interests will receive the following treatment:

Class 1.   Class 1 is impaired under the Plan within the meaning of § 1124 of the Bankruptcy Code. The only Secured Claim of which AirOcare is aware is the Secured Claim held by ARC. The Secured Claim of ARC shall be paid from Available Cash in Quarterly Installments until such Secured Claim is paid in full, unless other terms of payment are agreed to by the parties. Upon the Effective Date, the Security Agreement and the Secured Note

shall be adopted and incorporated into the Plan and shall be binding upon the Reorganized Debtor consistent with their terms and the Plan. ARC shall retain all liens and security interests it holds in the property of AirOcare under its loan documents.

**Class 2.** Class 2 Priority Tax Claims are unimpaired under the Plan within the meaning of § 1124 of the Bankruptcy Code and holders of Class 2 Priority Tax Claims. AirOcare does not believe that any Non-Tax Priority Claims exist. Should any such Claims exist, they would not be impaired under § 1124 of the Bankruptcy Code and would be deemed to have accepted the Plan. Any Class 2 Claim that is a Disputed Claim or that has not yet become an Allowed Claim as of the Effective Date shall be paid pursuant to this paragraph after it becomes an Allowed Claim by a Final order.

**Non-Tax Priority Claims**. Unless entitled to priority under § 507(a)(8) of the Bankruptcy Code, any Class 2 Claim shall be paid (a) in full in Available Cash on the later of the Effective Date or thirty (30) days after any such claim becomes an Allowed Claim, or (b) upon such other terms as may be agreed to by the holder of such Claim and the Reorganized Debtor.

**Priority Tax Claims**. Any Class 2 Claim which is entitled to priority under § 507(a)(8) of the Bankruptcy Code shall be paid in full in Available Cash (a) Pro Rata in equal Quarterly Installments so that the Allowed amount of such Claim plus Legal Interest shall be paid in full no later than five (5) years following the Petition Date, or (b) upon such other terms as may be agreed to by the holder of such Claim and the Reorganized Debtor.

**Class 3.** Class 3 is impaired under the Plan within the meaning of § 1124 of the Bankruptcy Code and holders of Class 3 Claims have the right to vote to accept or reject the Plan. Any Class 3 Claim that is a Disputed Claim or that has not yet become an Allowed Claim as of the Effective Date shall be paid pursuant to this paragraph after it becomes an Allowed Claim by a Final order. Each Allowed Class 3 Claim shall be paid (a) in Available Cash Pro Rata and to the extent of sufficient funds by payment of Quarterly Installments so that the Allowed amount of such Claim plus Legal Interest shall be paid in full no later than October 1, 2017, or (b) upon such other terms as may be agreed to by the holder of such Claim and the Reorganized Debtor. Holders of Class 3 Claims are not entitled to, and shall not receive, any distribution of Available Cash on account of such Allowed Claims under the Plan until the holder of the Allowed Class 1 Claim has been paid in full.

**Class 4.** Class 4 is unimpaired under the Plan within the meaning of § 1124 of the Bankruptcy Code and is deemed to have accepted the Plan. Upon the Effective Date, all holders of Equity Interests in AirOcare shall retain the Equity Interests that they held on the Effective Date. Holders of Equity Interests in AirOcare are not entitled to, and shall not receive, any distribution of Available Cash on account of such Equity Interests under the Plan until holders of all Allowed Claims have been paid in full with Legal Interest.

## VI. MEANS FOR EXECUTION OF THE PLAN

### A. Post-Confirmation Operations.

On the Effective Date, all Assets of AirOcare shall be deemed to be the property of and vest in the Reorganized Debtor, free and clear of all liens, claims, encumbrances or interests, subject only to the liens and security interests held by ARC. Upon and after the Effective Date, the Reorganized Debtor shall have all powers provided for under this Plan and the Confirmation Order and shall have all of the powers of a trustee under the Bankruptcy Code.

### B. Funding of the Plan.

The Plan shall be funded with Available Cash, which, as defined under the Plan, consists of cash or cash equivalents (a) generated by the Reorganized Debtor through its operations after the Effective Date, (b) recovered from Causes of Action after the Effective Date, (c) transferred to the Reorganized Debtor by AirOcare on the Effective Date, or (d) generated by the Reorganized Debtor in any other way after the Effective Date, including proceeds of any exit financing.

### C. Causes of Action.

All Causes of Action shall vest in the Reorganized Debtor on the Effective Date, and the Reorganized Debtor shall have full power and authority to pursue such Causes of Action for the benefit of AirOcare's creditors. The proceeds of all Causes of Action shall be deemed to be Available Cash and shall be administered pursuant to the provisions of this Plan. All Avoidance Actions (a) shall survive entry of the Confirmation Order, (b) shall vest in the Reorganized Debtor, and (iii) shall not be barred or limited by estoppel, whether judicial, equitable, or otherwise.

## VII. DISTRIBUTIONS

### A. Reorganized Debtor.

The Reorganized Debtor shall have all rights, duties and powers set forth in the Plan, including, without limitation, the duty to review and object to Claims and make distributions pursuant to the terms of the Plan and the Confirmation Order. The Reorganized Debtor shall have all the powers of a trustee under the Bankruptcy Code.

### B. Distribution Fund

All Available Funds shall be deposited in one or more accounts held by the Reorganized Debtor from which all distributions under this Plan shall be made.

### C. Miscellaneous

The Reorganized Debtor may stop payment on any distribution check that has not cleared the payer bank within ninety (90) days of the date of distribution of such check. No

distribution under the sum of $10.00 is required to be made by the Reorganized Debtor. Any fees payable under 28 U.S.C. § 1930 accruing after the Effective Date shall be timely paid by the Reorganized Debtor.

## VIII.   EFFECT OF CONFIRMATION

### A.      Binding Effect

On and after the Effective Date, the provisions of the Plan shall bind any holder of a Claim against, or Equity Interest in, AirOcare and such holder's respective successors and assigns, whether or not the Claim or Equity Interest of such holder is impaired under the Plan and whether or not such holder has accepted the Plan.

### B.      Discharge and Injunction

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER: (A) ON THE EFFECTIVE DATE, THE REORGANIZED DEBTOR SHALL BE DEEMED DISCHARGED AND RELEASED PURSUANT TO § 1141 OF THE BANKRUPTCY CODE FROM ALL CLAIMS AND INTERESTS, INCLUDING, BUT NOT LIMITED TO, DEMANDS, LIABILITIES, CLAIMS AND INTERESTS THAT AROSE BEFORE THE EFFECTIVE DATE AND ALL DEBTS OF THE KIND SPECIFIED IN §§ 502(g), 502(h) OR 502(i) OF THE BANKRUPTCY CODE, WHETHER OR NOT (I) A PROOF OF CLAIM BASED ON SUCH CLAIM OR DEBT HAS BEEN FILED OR DEEMED FILED PURSUANT TO § 501 OF THE BANKRUPTCY CODE, (II) A CLAIM BASED ON SUCH CLAIM OR DEBT IS ALLOWED PURSUANT TO § 502 OF THE BANKRUPTCY CODE, OR (C) THE HOLDER OF SUCH A CLAIM HAS ACCEPTED THE PLAN; AND (B) ALL PERSONS SHALL BE PRECLUDED FROM ASSERTING AGAINST THE REORGANIZED DEBTOR, ITS RESPECTIVE SUCCESSORS, OR THEIR RESPECTIVE ASSETS OR PROPERTIES ANY OTHER OR FURTHER CLAIMS BASED UPON ANY ACT OR OMISSION, TRANSACTION, OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED PRIOR TO THE EFFECTIVE DATE. EXCEPT AS OTHERWISE PROVIDED HEREIN, CONFIRMATION OF THE PLAN SHALL VOID ANY JUDGMENT AGAINST AIROCARE AT ANY TIME OBTAINED TO THE EXTENT THAT IT RELATES TO A CLAIM DISCHARGED.

EXCEPT AS OTHERWISE PROVIDED HEREIN OR IN THE CONFIRMATION ORDER, ON AND AFTER THE EFFECTIVE DATE, ALL PERSONS WHO HAVE HELD, CURRENTLY HOLD OR MAY HOLD A DEBT OR CLAIM AGAINST AIROCARE OR THE REORGANIZED DEBTOR OR THEIR PROPERTY OR ASSETS ARE PERMANENTLY ENJOINED FROM TAKING ANY OF THE FOLLOWING ACTIONS ON ACCOUNT OF ANY SUCH DEBT OR CLAIM: (I) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING AGAINST AIROCARE, THE REORGANIZED DEBTOR OR THEIR RESPECTIVE SUCCESSORS OR ASSIGNS OR THEIR ASSETS OR PROPERTY; (II) ENFORCING, ATTACHING, COLLECTING OR RECOVERING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST AIROCARE, THE REORGANIZED DEBTOR OR THEIR RESPECTIVE SUCCESSORS OR ASSIGNS OR THEIR ASSETS OR PROPERTY; (III) CREATING,

PERFECTING OR ENFORCING ANY LIEN OR ENCUMBRANCE AGAINST AIROCARE, THE REORGANIZED DEBTOR OR THEIR RESPECTIVE SUCCESSORS OR ASSIGNS OR THEIR ASSETS OR PROPERTY; AND (IV) COMMENCING OR CONTINUING ANY ACTION, IN ANY MANNER, IN ANY PLACE THAT DOES NOT COMPLY WITH OR IS INCONSISTENT WITH THE PROVISIONS OF THE PLAN OR THE CONFIRMATION ORDER. ANY PERSON, INCLUDING BUT NOT LIMITED TO AIROCARE OR THE REORGANIZED DEBTOR, INJURED BY ANY WILLFUL VIOLATION OF ANY INJUNCTION IMPOSED BY THE PLAN OR CONFIRMATION ORDER SHALL RECOVER ACTUAL DAMAGES, INCLUDING COSTS AND ATTORNEYS' FEES, AND, IN APPROPRIATE CIRCUMSTANCES, MAY RECOVER PUNITIVE DAMAGES, FROM THE WILLFUL VIOLATOR.

## IX. PROCEDURES FOR RESOLVING AND TREATING DISPUTED CLAIMS

### A. Generally

The Reorganized Debtor may file an objection to the allowance of any Claim, or any other appropriate motion or adversary proceeding with respect to allowance of any such Claim, with the Bankruptcy Court. All such objections will be litigated to Final order; provided, however, that the Reorganized Debtor may compromise and settle, withdraw or resolve by any other method approved by the Bankruptcy Court, any such objections to Claims. In addition, the Reorganized Debtor may, at any time, request that the Bankruptcy Court estimate any Claim under § 502(c) of the Bankruptcy Code, regardless of whether such Claim has been previously objected to or whether the Bankruptcy Court has ruled on any such objection. All of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another.

### B. Distribution Pending and After Allowance

Notwithstanding any other provision of the Plan, no distribution shall be made to the holder of a Disputed Claim or the holder of a Claim that is the subject of a proceeding against it by the AirCare or the Reorganized Debtor, unless and until such Disputed Claim becomes an Allowed Claim by Final order. While disputes regarding Claims are pending, the Reorganized Debtor shall hold for the benefit of each holder of a Disputed Claim an amount equal to the distributions that would have been made to the holder of such Disputed Claim if it were an Allowed Claim, or, if so determined by the Bankruptcy Court, such amount as estimated by the Bankruptcy Court under § 502(c) of the Bankruptcy Code, until such Claim becomes an Allowed Claim.

As soon as practicable after a Disputed Claim becomes an Allowed Claim, the holder of such Allowed Claim will receive all distributions to which such holder is then entitled under the Plan on account of such Allowed Claim. Any holder of both an Allowed Claim and a Disputed Claim will receive the appropriate distribution on the Allowed Claim, although no distribution will be made on the Disputed Claim until such dispute is resolved by settlement or Final order. After resolution of a dispute, any cash previously reserved for such Disputed Claim and not paid in connection with the resolution thereof shall be paid consistent with the terms of and order of the Bankruptcy Court or in the next Quarterly Installment.

## X.        EXECUTORY CONTRACTS

The Hussmann License Agreement shall be assumed by AirOcare on the Effective Date pursuant to § 365 of the Bankruptcy Code.

The license agreement between AirOcare and Safe Space, Inc. shall be rejected by AirOcare on the Effective Date pursuant to § 365 of the Bankruptcy Code.

The Confirmation Order shall automatically constitute an order approving the rejection, as of the Effective Date, of all other executory contracts and unexpired leases of AirOcare that existed on the Petition Date except for (a) any executory contracts or unexpired lease which AirOcare (i) rejected, (ii) assumed, or (iii) assumed and assigned to third parties on or before the Effective Date; or (b) any executory contracts or unexpired leases which are the subject of a motion to (i) reject, (ii) assume, or (iii) assume and assign filed prior to the Effective Date that has not been ruled upon by the Bankruptcy Court as of the Effective Date.

Unless subject to the Bar Date, all Claims arising from the rejection of executory contracts or unexpired leases shall be filed and served upon AirOcare and the United States Trustee within thirty (30) days after the later of (a) entry of a Final order authorizing such rejection or (b) the date on which the  Confirmation Order becomes a Final order.  Any such claim not filed within the required time period shall be deemed disallowed.

## XI.        MODIFICATION

AirOcare reserves the right in accordance with the Bankruptcy Code to amend or modify this Plan prior to the Confirmation Date.  After AirOcare files any amendment or modification to the Plan, the Plan, as amended or modified, becomes the Plan.

AirOcare may modify this Plan at any time after the Confirmation Date regardless of whether this Plan has been substantially consummated within the meaning of §§ 1101(2) & 1127(b) of the Bankruptcy Court, if circumstances warrant such modification, if all required disclosure under § 1125 of the Bankruptcy Code has been given, and the Bankruptcy Court, after notice and a hearing, confirms the Plan as modified.

## XII.        CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

Under the Plan, Confirmation is subject to:

(a)        The Bankruptcy Court having approved this Disclosure Statement by order entered on the docket of the Chapter 11 Case; and

(b)        The presentment of a Confirmation Order to the Bankruptcy Court for entry to confirm the Plan.

Under the Plan, the occurrence of the Effective Date is subject to:

(a)        The Confirmation Order becoming a Final order; and

(b)     No stay of the Confirmation Order shall then be in effect.

## XIII.   RETENTION OF JURISDICTION

The Bankruptcy Court shall retain jurisdiction after confirmation of the Plan for the following purposes:

(a)     to determine the allowance and classification of any Claim, the re-examination of Claims which have been allowed for purposes of voting, and the determination of any objections to Claims that may have been or may be filed;

(b)      to determine motions to estimate a Claim at any time, regardless of whether the Claim to be estimated is the subject of a pending objection, a pending appeal, or otherwise;

(c)     to determine motions to subordinate Claims at any time and on any basis permitted by applicable law;

(d)     to construe or take any action to enforce the Plan, and to issue such orders as may be necessary for the implementation, execution, and consummation of the Plan;

(e)     to determine any and all applications for allowance of compensation or reimbursement of expenses of Professionals;

(f)     to determine any other requests for payment of Administrative Expense Claims;

(g)     to resolve any disputes arising under or relating to the Plan;

(h)     to modify the Plan pursuant to § 1127 of the Bankruptcy Code and the Bankruptcy Rules;

(i)     to take any action to correct any defect, cure any omission, or reconcile any inconsistency in the Plan or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan;

(j)     to enter any order, including injunctions, necessary to enforce the rights, title and powers of AirOcare or the Reorganized Debtor and to impose such limitations, restrictions, terms and conditions of such rights, title and powers as the Bankruptcy Court may deem necessary;

(k)     to enforce any order previously entered by the Bankruptcy Court in the Chapter 11 Case and to enter the Closing Order;

(l)     to determine pending applications for the assumption or rejection of executory contracts or unexpired leases to which AirOcare is a party or with respect to which AirOcare may be liable, and to hear and determine any Claims arising therefrom;

(m)     to determine applications, adversary proceedings and contested or litigated matters and all Causes of Action, whether pending on the Effective Date or commenced thereafter;

(n)     to issue orders in aid of execution of the Plan to the extent authorized by § 1142 of the Bankruptcy Code;

(o)     to determine such other matters as may be set forth in the Confirmation Order;

(p)     to consider and act on the compromise and settlement of any Claim against, or cause of action on behalf of, the Debtor or the estate;

(q)     to enter such orders as may be necessary or appropriate in connection with the Debtor or the Debtor's Assets wherever located; and

(r)     to hear and determine any motions or contested matters involving taxes, tax refunds, tax attributes and tax benefits and similar and related matters with respect to the Debtor arising prior to the Effective Date or relating to the administration of the Chapter 11 Case, including, without limitation, matters involving Federal, state and local taxes in accordance with §§ 346, 505 and 1146 of the Bankruptcy Code.

## XIV.  ALTERNATIVES TO THE PLAN

### A.     Distributions Under the Plan

As shown in the Distribution Analysis which is attached hereto as Exhibit C, the Plan provides for payment in full of all Allowed Claims from Available Cash in Quarterly Installments over a period of time ending on October 1, 2017, the expiration of the Hussmann License Agreement.  The Distribution Analysis depicts four distribution scenarios.  First, it projects distribution under a chapter 7 liquidation which is described below.  Second, the Distribution Analysis shows the distribution that will be made if only the minimum quarterly royalties are paid under the Hussmann License Agreement.  The third distribution projection details the distributions to be expected if the royalties under the Hussmann License Agreement

are at a mid-point between the maximum and minimum levels and the fourth scenario depicts distributions assuming payment of the maximum royalty under the Hussmann License Agreement.

As described above in § III.H of this Disclosure Statement, AirOcare is pursuing further development of its technology, both with regard to the Hussman License Agreement and with regard to fields of use outside of that agreement. AirOcare expects to generate significant future revenue from the development of its technology and the Patent. The exact nature of these future developments and the amount of revenue that they will generate is impossible to predict with accuracy at this time, however. Accordingly, all of the distribution scenarios detailed in the Distribution Analysis include no additional revenues from applications of the Patent to fields of use outside the scope of the Hussmann License Agreement. Despite AirOcare's inability to accurately predict future revenues, the Plan is structured so that net operating revenues following confirmation of the Plan will be distributed in conformity with the distribution priorities found in § 726 of the Bankruptcy Code that are operative in Chapter 7 cases. Consistent with that provision of the Bankruptcy Code, the Plan provides for payment of interest at the legal rate until all Claims are paid in full.

**B.      Liquidation Under Chapter 7**

If the Plan or any other chapter 11 plan cannot be confirmed under § 1129(a) and (b) of the Bankruptcy Code, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code, in which case a chapter 7 trustee would be appointed or elected to liquidate any remaining Assets of the estate for distribution to creditors pursuant to chapter 7 of the Bankruptcy Code. If a trustee is appointed and the estate's remaining Assets are liquidated under chapter 7 of the Bankruptcy Code, all creditors holding Allowed Unsecured Claims will likely receive distributions of a lesser value on account of their Allowed Claims than they would under the Plan.

The primary causes of reduced distribution under chapter 7 are threefold. First, a liquidation sale of the Patent and the Hussmann License Agreement would result in deeply discounted values for the Assets, particularly the Hussmann License Agreement. Because Hussmann has the right to cancel the Hussmann License Agreement at any time, its probable liquidation value would be steeply discounted from the present value of the remaining royalty payment stream.

Additionally, the appointment of a chapter 7 trustee would also diminish the anticipated recovery through AirOcare's operations. In addition to the income which will be generated by the Hussmann License Agreement, AirOcare will be developing additional applications for its technology and the Patent. Development of the Patent and related technology will allow for strategic development of AirOcare's business which would be impossible if the Patent and the Hussmann License Agreement were liquidated by a chapter 7 trustee. A chapter 7 trustee would come to the case without the detailed understanding of AirOcare's Assets, and would liquidate them in a faster, auction type sale that would not realize maximum value.

Finally, the appointment of a chapter 7 trustee and the probable retention of new professionals, who would be strangers to the case, would add an additional layer of professional

fees to the case. The additional layer of expense would not by itself result in any greater recovery on assets or in any greater success in claims objections. Further, the additional expense added by appointment of a trustee would diminish creditor recovery. Accordingly, distributions under the Plan will more than likely result in greater recovery than would be obtained by liquidation by an appointed or elected chapter 7 trustee.

## C.     Alternative Chapter 11 Plan

If the Plan is not confirmed, any other party in interest may attempt to formulate an alternative chapter 11 plan which could provide for the liquidation and distribution of AirOcare's Assets other than as provided by the Plan. However, AirOcare intends to further develop its anti-microbial ROS air purification business. AirOcare believes that any alternative chapter 11 plan will be inferior to the Plan because it would not maximize the fully developed value of AirOcare's technology and the Patent and would delay creditors' receipt of distributions and, due to smaller amounts of revenue that will be generated absent a careful and strategic development of AirOcare's technology, would likely provide for smaller distributions to holders of Claims (and potentially Equity Interest holders) than are currently provided for in the Plan. Accordingly, AirOcare believes that the Plan will enable all Creditors and Equity Interest holders to realize the greatest possible recovery.

## XV. VOTING ON THE PLAN

## A.     Ballots and Voting Deadline

Each holder of an Allowed Claim entitled to vote on the Plan has been sent, by mail, a ballot, together with this Disclosure Statement. The ballot is to be used for voting to accept or reject the Plan.[3]

The Bankruptcy Court has directed that, to be counted for voting purposes, ballots must be mailed or delivered so that they are ACTUALLY RECEIVED by counsel to AirOcare no later than 5:00 p.m. East Coast time on March 1, 2011, at the following address. Ballots must be sent by United States mail or commercial overnight delivery and may not be sent by email or fax.

> Lawrence A. Katz, Esquire
> Venable LLP
> 8010 Towers Crescent Drive, Suite 300
> Vienna, VA  22182
> Phone:  (703) 760-1921

**TO BE COUNTED, YOUR BALLOT MUST BE ACTUALLY RECEIVED BY 5:00 P.M. EASTERN STANDARD TIME ON MARCH 1, 2011.  Ballots must be sent by United States mail or commercial overnight delivery and may not be sent by email or fax.**

---

[3] A copy of the Class 1 Ballot is attached hereto as Exhibit D and the Class 3 Ballot as Exhibit E.

**B.      Parties in Interest Entitled to Vote**

Any Creditor whose Claim is impaired under the Plan is entitled to vote if either (i) such holder's Claim is scheduled (and such Claim is not scheduled as disputed, contingent or unliquidated), or (ii) such holder has timely filed a proof of claim which (a) currently is not the subject of an objection which has not been withdrawn, and (b) has not been disallowed by a Final order.  A vote of any Creditor may be disregarded if the Bankruptcy Court determines that such vote was not solicited or procured in good faith and in accordance with the Bankruptcy Code.

A Creditor who is not entitled to vote on the Plan may file a motion with the Bankruptcy Court for an order temporarily allowing its Claim for purposes of voting to accept or reject the Plan.  Any such motion must be timely filed with the Bankruptcy Court (in accordance with the Bankruptcy Rules and the applicable rules of the Bankruptcy Court) so as to be heard and determined by the Bankruptcy Court at or before the confirmation hearing.

**IF YOU HAVE ANY QUESTIONS REGARDING THE PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT AIROCARE'S COUNSEL:**

> Lawrence A. Katz, Esquire
> Venable LLP
> 8010 Towers Crescent Drive, Suite 300
> Vienna, VA  22182
> Phone:  (703) 760-1600

**C.      Impairment Under the Plan**

**Definition of Impairment**.  Under § 1124 of the Bankruptcy Code, a class of Claims or Equity Interests is "impaired" under a plan of reorganization unless such plan (a) leaves unaltered the legal, equitable and contract rights of each holder of a Claim or Equity Interest in such class, or (b) provides, among other things, for the cure of existing defaults and reinstatement of the maturity of the Claims or Equity Interests in such class.

**Impaired and Voting Classes.** The Class 1 Secured Claim and Class 3 Unsecured Claims are impaired under the Plan.  Holders of the Allowed Class 1 Secured Claim, and Class 3 Claims are entitled to vote to accept or reject the Plan.

**Unimpaired and Non-Voting Classes.**  Class 2 Claims are unimpaired and are therefore deemed to have accepted the Plan and therefore have no right to vote on the Plan. Holders of the Equity Interests in Class 4 will receive no distribution under the Plan, are therefore deemed to have rejected the Plan and thus does not have the right to vote on the Plan.

**XVI.   CONFIRMATION OF THE PLAN**

The Bankruptcy Court will confirm the Plan only if all of the requirements of § 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation are that the Plan: (i) is accepted by all impaired Classes of Claims entitled to vote or, if rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to

such class, and as to the impaired Classes of Claims and Equity Interests that are deemed to reject the Plan, (ii) is feasible, and (iii) is in the "best interests" of the holders of Claims impaired under the Plan.

## A.     Acceptance of the Plan

The Bankruptcy Code defines acceptance of a chapter 11 plan by a class of creditors as acceptance by creditors holding at least two-thirds (⅔) in dollar amount and a majority in number of the claims in such class, but for that purpose counts only those creditors that actually cast ballots.  Holders of claims that fail to vote are not counted as either accepting or rejecting a plan.

## B.     No Unfair Discrimination/Fair and Equitable Test

In the event that any impaired class of Claims or Equity Interests does not accept the Plan, the Bankruptcy Court may still confirm the Plan at the request of AirOcare if, as to each impaired class of Claims or Equity Interests which has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable."

A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of Claims or Equity Interests receives more than it legally is entitled to receive for its Claims or Equity Interests.

Under the Bankruptcy Code, "fair and equitable" has different meanings for secured and unsecured claims.  With respect to a secured claim, "fair and equitable" means (i) the impaired secured creditor retains its liens to the extent of its allowed claim and receives deferred cash payments at least equal in value to the allowed amount of its claim with a present value as of the effective date of the plan at least equal in value to such creditor's interest in the estate's interest in the property securing its claim, (ii) if property subject to the lien of the impaired secured creditor is sold free and clear of that lien, the lien attaches to the proceeds of the sale, and such lien proceeds are treated in accordance with clause (i) or (iii) of this paragraph, or (iii) if the impaired secured creditor realizes the "indubitable equivalent' 'of its claim under the plan.

With respect to an unsecured claim, "fair and equitable" means either (i) each impaired unsecured creditor receives or retains property of a value, as of the effective date of the plan, equal to the amount of its allowed claim, or (ii) the holders of claims or equity interests that are junior to the claims or equity interests of the dissenting class will not receive or retain any property under the plan.

With respect to equity interests, "fair and equitable" means that each equity interest holder (a) ill receive or retain property of a value, as of the effective date of the plan, equal to the greatest of (i) the allowed amount of any fixed liquidation preference to which such holder is entitled, (ii) any fixed redemption price to which such holder is entitled, or (iii) the value of such equity interest; or (b) the holder of any equity interest that is junior to the equity

interests of such class will not receive or retain any property under the plan on account of such junior equity interest.

Under the Plan, no holder in a class of Claims is to receive cash or other property in excess of the full amount of its Allowed Claim. As to any holders of Allowed Secured Claims, the Plan provides that each such holder will either retain its collateral or receive on the Effective Date (or as soon thereafter as is practicable) cash equal in value to its Allowed Secured Claim. As to holders of Unsecured Claims, no holder of an Equity Interest with rights junior to holders of Unsecured Claims will receive any distributions or retain any property under the Plan until holders of all Claims have been paid in full with Legal Interest. Accordingly, AirOcare believes that the Plan does not discriminate unfairly as to any impaired class of Claims or Equity Interests and is fair and equitable with respect to each such Class.

## C.     "Best Interests" Test

The Code provides that the Plan will not be confirmed, regardless of whether or not anyone objects to confirmation, unless the Bankruptcy Court finds that the Plan is in the "best interests" of all Classes of Claims which are impaired. The "best interests" test will be satisfied by a finding of the Bankruptcy Court that either (i) all holders of impaired Claims have accepted the Plan, or (ii) the Plan will provide such a holder that has not accepted the Plan with a recovery at least equal in value to the recovery such holder would receive if AirOcare were liquidated under chapter 7 of the Bankruptcy Code.

The starting point in determining whether the Plan meets the "best interests" test is a determination of the amount of proceeds that would be generated from the liquidation of the estate's remaining Assets in the context of a chapter 7 liquidation. Such value must then be reduced by the costs of such liquidation, including costs incurred during the Chapter 11 Case and allowed under chapter 7 of Bankruptcy Code (such as trustee's fees, and fees and expenses of professionals retained by a trustee). The potential chapter 7 liquidation distribution in respect of each class must be further reduced by costs imposed by the delay caused by conversion to Chapter 7. The net present value of a hypothetical chapter 7 liquidation distribution in respect of an impaired class is then compared to the recovery in respect of such class provided for in the Plan. AirOcare's Distribution Analysis, which includes projected distributions under chapter 7, is annexed hereto as Exhibit C.

For the reasons set forth above, AirOcare submits that each impaired class will receive under the Plan a recovery at least equal in value to the recovery such class would receive pursuant to a liquidation under chapter 7 of the Bankruptcy Code.

## D.     Feasibility

Section 1129(a)(11) of the Bankruptcy Code provides that a chapter 11 plan may be confirmed only if the Bankruptcy Court finds that such plan is feasible. A feasible plan is one which will not lead to a need for further reorganization or liquidation. Since the Plan provides for the reorganization of AirOcare, the Bankruptcy Court will find that the Plan is feasible if it determines that the conditions precedent to the Effective Date can be satisfied and that the estate will generate sufficient funds to meet its post-confirmation obligations to pay for the costs of

administering and fully consummating the Plan and closing the Chapter 11 Case. AirOcare believes that the Plan satisfies the financial feasibility requirement imposed by the Bankruptcy Code.

## E.    Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan (the "Confirmation Hearing"). Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan.

**PURSUANT TO A RULING OF THE BANKRUPTCY COURT AT A HEARING HELD ON JANUARY 11, 2011, THE CONFIRMATION HEARING HAS BEEN SCHEDULED FOR MARCH 8, 2011, AT 11:00 A.M. EASTERN STANDARD TIME, IN THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF VIRGINIA, 200 SOUTH WASHINGTON STREET, THIRD FLOOR, ALEXANDRIA, VIRGINIA 22314.**

**ANY OBJECTION TO CONFIRMATION MUST BE MADE IN WRITING, FILED WITH THE BANKRUPTCY COURT AND SERVED UPON THE FOLLOWING PARTIES, TOGETHER WITH PROOF OF SERVICE THEREOF, SO AS TO BE ACTUALLY RECEIVED ON OR BEFORE MARCH  1, 2011 AT 5:00 P.M. EASTERN TIME:**

> Lawrence A. Katz
> Venable LLP
> 8010 Towers Crescent Drive, Ste. 300
> Vienna, VA 22182
>
> and
>
> Office of the United States Trustee
> 115 South Union Street, Ste. 210
> Alexandria, VA  22314

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.

UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

At the Confirmation Hearing, the Bankruptcy Court must determine whether the requirements of § 1129 of the Bankruptcy Code have been satisfied and, upon demonstration of such compliance, the Bankruptcy Court will enter the Confirmation Order.

## XVII.  CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes certain Federal income tax consequences of the Plan to AirOcare and holders of Claims and Equity Interests. This summary is based upon

the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder, judicial decisions and published administrative rulings and pronouncements of the IRS, as in effect on the date hereof. Legislative, judicial or administrative changes or interpretations enacted or promulgated hereafter could alter or modify the analysis and conclusions set forth below. Any such changes or interpretations may be retroactive and could affect significantly the Federal income tax consequences discussed below. This summary does not address foreign, state or local tax law, or any estate or gift tax consequences of the Plan, nor does it purport to address the Federal income tax consequences of the Plan to special categories of taxpayers who are holders of Claims (such as taxpayers who are not domestic corporations or citizens or residents of the United States, or are S corporations, banks, mutual funds, insurance companies, financial institutions, regulated investment companies, broker-dealers and tax-exempt organizations) and assumes that each Creditor holds its Claim directly.

The Federal income tax consequences of the Plan are complex and are subject to significant uncertainties. AirOcare has not requested and will not request a ruling from the IRS with respect to any of the tax aspects of the Plan.

**THE TAX CONSEQUENCES TO HOLDERS OF CLAIMS AND EQUITY INTERESTS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER. MOREOVER, THE TAX CONSEQUENCES OF CERTAIN ASPECTS OF THE PLAN ARE UNCERTAIN DUE TO THE LACK OF APPLICABLE LEGAL PRECEDENT AND THE POSSIBILITY OF CHANGES IN THE APPLICABLE TAX LAW. THERE CAN BE NO ASSURANCE THAT THE IRS WILL NOT CHALLENGE ANY OF THE TAX CONSEQUENCES DESCRIBED HEREIN, OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE SUSTAINED. ACCORDINGLY, EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS STRONGLY URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FOREIGN, FEDERAL, STATE AND LOCAL TAX CONSEQUENCES OF THE PLAN.**

**A.      Certain Federal Income Tax Consequences to AirOcare**

Upon information and belief, AirOcare is a Subchapter C corporation for Federal income tax purposes. Thus, AirOcare is subject to taxes imposed under chapter 1 of the Tax Code.

Accordingly, any net operating losses generated by AirOcare during a taxable year ("NOLs") will pass through to and can used by AirOcare, as the Reorganized Debtor, on a carryback or carryforward basis to offset income earned during a different taxable year.

Upon a sale by AirOcare of its property any recognized gain or loss equal to the difference between the pre-distribution sale proceeds and the AirOcare's adjusted tax basis in the property may be subject to capital gains tax. The amount of gain recognized will include the full proceeds from any sale of property, including the amount of any indebtedness assumed by the buyer to which the property is subject.

If the sale of the property results in a gain and such property was used in AirOcare's trade or business, such gain would generally be treated as a "section 1231 gain." Such gain would be combined with other Tax Code § 1231 gains and losses. Generally, Tax Code § 1231 gains and losses are offset against each other on an annual basis, and net gain is treated as long-term capital gain, while net loss is treated as ordinary loss. Net § 1231 gains must, however, be treated as ordinary income to the extent of net § 1231 losses taken over the five most recent years, to the extent such losses have not been previously "recaptured."

**B.      Certain Federal Income Tax Consequences to Creditors**

The Federal income tax consequences of the Plan to a Creditor will depend upon several factors, including but not limited to: (i) whether the Creditor's Claim (or portion thereof) constitutes a Claim for principal or interest; (ii) whether the Creditor is a resident of the United States for tax purposes (or falls into any of the special classes of taxpayers excluded from this discussion as noted above); and (iii) whether the Creditor has taken a bad debt deduction with respect to its Claim. In addition, if a Claim is a "security" for tax purposes, different rules may apply. **CREDITORS ARE STRONGLY ADVISED TO CONSULT WITH THEIR TAX ADVISORS WITH RESPECT TO THE TAX TREATMENT UNDER THE PLAN OF THEIR PARTICULAR CLAIMS.**

A Creditor receiving solely cash in exchange for its Claim will generally recognize taxable gain or loss in an amount equal to the difference between the amount realized and its adjusted tax basis in the Allowed Claim. The amount realized will equal the amount of cash to the extent that such consideration is not allocable to any portion of the Allowed Claim representing accrued and unpaid interest, as further discussed below.

The character of any recognized gain or loss (i.e., ordinary income, or short-term or long-term capital gain or loss) will depend upon the status of the Creditor, the nature of the Allowed Claim in the Creditor's hands, the purpose and circumstances of its acquisition, the Creditor's holding period of the Allowed Claim, and the extent to which the Creditor previously claimed a deduction for the worthlessness of all or a portion of the Allowed Claim. A loss generally is treated as sustained in the taxable year for which there has been a closed and completed transaction, and no portion of a loss with respect to which there is a reasonable prospect of reimbursement may be deducted until it can be ascertained with reasonable certainty whether or not such reimbursement will be recovered.

A portion of the consideration received by a Creditor in satisfaction of an Allowed Claim may be allocated to the portion of such Claim (if any) that represents accrued but unpaid interest. If any portion of the distribution were required to be allocated to accrued interest, such portion would be taxable to the Creditor as interest income, except to the extent the Creditor has previously reported such interest as income.

In the event that a Creditor has not previously reported the interest income, only the balance of the distribution after the allocation of proceeds to accrued interest would be considered received by the Creditor in respect of the principal amount of the Allowed Claim. Such an allocation would reduce the amount of the gain, or increase the amount of loss, realized

by the Creditor with respect to the Allowed Claim.  If such loss were a capital loss, it would not offset any amount of the distribution that was treated as ordinary interest income (except, in the case of individuals, to the limited extent that capital losses may be deducted against ordinary income).

**C.**     **Federal Income Tax Consequences to Holders of Equity Interests Receiving No Distributions.**

Holders of allowed Equity Interests receiving no distributions will generally recognize loss in the amount of each such holder's adjusted tax basis in the Equity Interest.

The character of any recognized loss (i.e., ordinary income, or short-term or long-term capital gain or loss) will depend upon the status of the holder, the nature of the Equity Interest in the holder's hands, the purpose and circumstances of its acquisition, the holder's holding period, and the extent to which the holder had previously claimed a deduction for the worthlessness of all or a portion of the Equity Interest.

A loss generally is treated as sustained in the taxable year for which there has been a closed and completed transaction, and no portion of loss with respect to which there is a reasonable prospect of reimbursement may be deducted until it can be ascertained with reasonable certainty whether or not such reimbursement will be recovered.

**D.**     **Information Reporting and Backup Withholding.**

All distributions to holders of Allowed Claims under the Plan are subject to any applicable withholding requirements.  Under Federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at a rate of 28%.  Backup withholding generally applies if the holder fails to provide a taxpayer identification number or fails to otherwise establish an exemption.  The amount of any backup withholding will be allowed as a credit against the holder's Federal income tax liability and may entitle such holder to a refund.  Certain persons, including corporations and financial institutions, are generally exempt from backup withholding.

**E.**     **Importance of Obtaining Professional Tax Assistance.**

No holder of a Claim or Equity Interest should rely on the tax discussion in this Disclosure Statement in lieu of consulting with one's own tax professional.  The foregoing is intended to be a summary only and not a substitute for consultation with a tax professional.  The Federal, state, local and foreign tax consequences of the Plan are complex and, in some respects, uncertain.  Such consequences may also vary based upon the individual circumstances of each holder of a Claim or Equity Interest.  Accordingly, each holder of a Claim or Equity Interest is strongly urged to consult with its own tax advisor regarding the Federal, estate, local and foreign tax consequences of the Plan.

# XVIII.    CONCLUSION

AIROCARE BELIEVES THAT THE PLAN COMPLIES IN ALL RESPECTS WITH CHAPTER 11 OF THE BANKRUPTCY CODE AND THAT ITS ACCEPTANCE WOULD BE IN THE BEST INTERESTS OF CREDITORS AND EQUITY INTEREST HOLDERS.  ACCORDINGLY,  AIROCARE URGES ALL HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN.

Dated:  January 11, 2011                                             AIROCARE, INC.


                                                                         */s/Eric Wells*
                                                                         Eric Wells
                                                                         President and CEO


*/s/Lawrence A. Katz*
Lawrence A. Katz (VA Bar No. 47664)
Frederick W. H. Carter (VA Bar No. 80204)
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia  22182
Telephone: 703-760-1600
Facsimile:  703-821-8949
lakatz@venable.com
fwhcarter@venable.com

Counsel For Debtor AirOcare, Inc.